UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| AMERICAN STEWARDS OF LIBERTY; CHARLES AND CHERYL SHELL; WALTER SIDNEY SHELL MANAGEMENT TRUST; KATHRYN HEIDEMANN; and ROBERT V. HARRISON, SR., | § § § § § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Civil No. 1:15-cv-01174-LY |
| DEPARTMENT OF THE INTERIOR; UNITED STATES FISH AND WILDLIFE SERVICE; SALLY JEWELL, in her official capacity as Secretary of the United States Department of the Interior; DANIEL M. ASHE, in his official capacity as Director of the United States Fish and Wildlife Service; and BENJAMIN TUGGLE, in his capacity as Southwest Regional Director of the United States Fish and Wildlife Service, | § § § § § § § § § § § § § § | |
| *Defendants*. | § § | |

**FIRST AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE RELIEF**

## I.  INTRODUCTION

1.      It is in the interest of all Americans that federal agencies efficiently utilize the limited resources provided to them by taxpayers, and that they exercise their regulatory authority in a manner that comports with both common sense and the law.  With regard to the Bone Cave harvestman (*Texella reyesi)* and the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. §§ 1531–1543, Defendants have done neither of these things. Defendants erroneously

concluded that the petition submitted by Kathryn Heidemann, Charles & Cheryl Shell, Walter Sidney Shell Management Trust, American Stewards of Liberty, and Steven W. Carothers (collectively, "Petitioners") under 16 U.S.C. § 1533(b)(3)(A) to delist the *Texella reyesi* from the list of threatened species under the ESA did not present substantial scientific information indicating that delisting may be warranted.  80 Fed. Reg. 30,990 (June 1, 2015) (hereinafter, "Negative Finding").  A true and correct copy of the June 1, 2015 *Texella reyesi* Delisting Petition, with its associated exhibits (the "Delisting Petition"), is attached as Exhibit A and incorporated by reference into this Complaint.

2.      Plaintiffs request that this Court order, declare, and adjudge that Defendants have violated the ESA and the Administrative Procedure Act ("APA"), §§ 5 U.S.C. 551–559, and that the Court set aside the Negative Finding.  This action also seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202.

## II.  JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (actions arising under the laws of the United States); 5 U.S.C. §§ 702–703 (actions arising under the APA); and 16 U.S.C. §§ 1533(b)(3)(C)(ii), 1540(c) (actions arising under the ESA).

4.      Defendants made the Negative Finding using an erroneous and improper standard, and failing to properly consider whether an error was made during the original decision to list.  The ESA expressly provides that a negative 90-day finding may be challenged in federal court. 16 U.S.C. § 1533(b)(3)(C)(ii).  An actual controversy exists therefore between the parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a), 2202.

5.      On September 14, 2015, out of an abundance of caution and in the hopes of spurring Defendants to reconsider their legally untenable and scientifically unjustified position,

Plaintiff American Stewards of Liberty provided Defendants notice of its intent to file this action on behalf of itself and other interested parties, pursuant to 16 U.S.C. § 1540(g)(2)(C). A true and correct copy of the 60-Day Notice of Intent to Bring a Citizen Suit pursuant to 16 U.S.C. § 1540(g), is attached hereto as Exhibit B and incorporated by reference into this Complaint. This notice was provided to Defendants despite the fact that no notice is required in order to bring suit under the APA or under section 4(b)(3)(C)(ii) of the ESA.

6.      Venue in this judicial district is proper under 28 U.S.C. § 1391(e)(1), because a substantial part of the events or omissions giving rise to the claim occurred in this district and in the State of Texas.

### III. PARTIES

7.      Plaintiff American Stewards of Liberty supports the protection of private property rights, fiscal responsibility, and environmental policy based upon sound principles of science, as well as cost-effective solutions to issues associated with property management. American Stewards of Liberty is a charitable organization under Section 501(c)(3) of the Internal Revenue Code. Its members are primarily comprised of farming and ranching families who have been stewards of the land for generations. American Stewards of Liberty supports, as part of its mission: the study and research of issues that affect the protection of property rights; education of the public through seminars, publications, and programs regarding the protection of property rights; and initiation of legal proceedings to protect property rights. American Stewards of Liberty advocates for a balanced approach to environmental regulation with respect to the administration of the ESA and property rights.

American Stewards of Liberty is concerned that the continued listing of *Texella reyesi* is both scientifically unjustified and imposes significant and unnecessary economic and regulatory

costs upon affected property owners and the regulated public.  Furthermore, public and private resources expended as a consequence of the continued listing of the species are being diverted from other activities, such as protecting species actually at risk of extinction and providing basic public goods to American citizens.  Members of the American Stewards of Liberty own property within the areas designated as *Texella reyesi*'s habitat, and some members' property actually contains occupied *Texella reyesi* habitat. One such member of the American Stewards of Liberty, John P. Yearwood, has occupied *Texella reyesi* habitat on his property in Williamson County, Texas, confirmed in a survey performed by properly licensed biologists hired by the Texas Department of Transportation.  Mr. Yearwood now may not use the portions of his land that are confirmed as *Texella reyesi* habitat without either risking an enforcement action by the USFWS or a third party, incurring the expense of seeking an incidental take permit from the U.S. Fish and Wildlife Service ("USFWS"), or incurring the expense of complying with state and local measures USFWS has deemed sufficient to avoid take of *Texella reyesi*.

American Stewards of Liberty's members whose property contains *Texella reyesi* occupied habitat or likely occupied habitat face the same choices that Mr. Yearwood faces – risking take stemming from the use and enjoyment of their property, incurring the cost of seeking an incidental take permit, or incurring the expense of complying with methods that the USFWS has deemed sufficient to avoid take.  This choice harms the liberty and economic interests of the affected members of the American Stewards of Liberty by forcing them to choose between incurring potentially significant costs of the actions described above or essentially abandoning their property.  Each American Stewards of Liberty member whose liberty and economic interests are harmed by the continued listing resides within the State of

Texas.  If Defendants were enjoined from violating the ESA and APA, the harm to the interests of the affected American Stewards of Liberty members caused by Defendants' actions would likely be eliminated, thereby redressing their economic injuries.  This is because Defendants likely would proceed with delisting *Texella reyesi*.

8.      Plaintiffs Charles and Cheryl Shell reside in Round Rock, Texas. Plaintiffs Charles and Cheryl Shell own property in Jarrell, Texas and Florence, Texas.  Plaintiffs' property falls within the identified range of *Texella reyesi* habitat in Williamson and Travis Counties, Texas.  There are karst formations on Plaintiffs' property that are likely occupied by *Texella reyesi*.  Plaintiffs' property has been directly harmed by the listing of *Texella reyesi* through the choice they must face regarding use of their land in the vicinity of karst formations – due to *Texella reyesi*' s endangered status, if Plaintiffs choose to make use of their land in the vicinity of karst formations, they must either seek an incidental take permit from the USFWS, bear the expense of complying with state and local plans deemed sufficient to avoid take, or risk an enforcement action by USFWS or third parties should an impermissible take occur. Plaintiffs Charles and Cheryl Shell are members of the American Stewards of Liberty.  If Defendants were enjoined from violating the ESA and APA, the harm to the interests of Plaintiffs Charles and Cheryl Shell caused by Defendants' actions would likely be eliminated, thereby redressing their economic injuries.  This is because Defendants likely would proceed with delisting *Texella reyesi*.

9.      Plaintiff Walter Sidney Shell Management Trust is located in Florence, Texas. Plaintiff owns property in Florence, Texas, which is in Williamson County.  Plaintiff's property occurs within the identified range of occupied habitat for *Texella reyesi* and contains karst formations that may be occupied by *Texella reyesi*.  Plaintiff's property has been directly

harmed by the listing of *Texella reyesi* by forcing Plaintiff, should Plaintiff seek to use any of its land in the vicinity of karst formations, to choose between risking an enforcement action by USFWS or a private party if any impermissible take of *Texella reyesi* should occur, or bearing the expense of either seeking an incidental take permit from USFWS or complying with state and local measures USFWS has determined are sufficient to avoid take.   The trustee of the Walter Sidney Shell Management Trust, Charles Shell, is a member of the American Stewards of Liberty.   If Defendants were enjoined from violating the ESA and APA, the harm to the interests of Plaintiff Walter Sidney Shell Management Trust caused by Defendants' actions would likely be eliminated, thereby redressing its economic injuries.   This is because Defendants would likely proceed with delisting *Texella reyesi*.

10.     Plaintiff Kathryn Heidemann resides in Georgetown, Texas.   Plaintiff Heidemann owns property in Georgetown, Texas, which is in Williamson County, within the area identified as possessing *Texella reyesi* habitat.   Plaintiff Heidemann is a long-time member of American Stewards of Liberty and was one of the parties who petitioned for delisting of *Texella reyesi*.   Plaintiff's property contains karst formations that may be occupied by *Texella reyesi*.   Plaintiff's property has been directly harmed by the listing of *Texella reyesi* because if she wishes to use portions of her property in the vicinity of karst formations, she must now either risk an enforcement action against her by USFWS or a private party should an impermissible take occur, or bear the expense of either seeking an incidental take permit from USFWS or the expense of compliance with the state or local measures that have been approved as avoiding take.   If Defendants were enjoined from violating the ESA and APA, the harm to the interests of Plaintiff Heidemann caused by Defendants' actions would likely be eliminated,

thereby redressing her economic injuries.  This is because Defendants likely would proceed with delisting *Texella reyesi*.

11.     Plaintiff Robert V. Harrison, Sr. resides in Georgetown, Texas.   Plaintiff Harrison owns property along Lake Georgetown in Williamson County, Texas, within the area identified as possessing *Texella reyesi* occupied karst formations.  Karst formations occur on Plaintiff Harrison's property that may be occupied by *Texella reyesi*.  Plaintiff's property has been directly harmed by the listing of *Texella reyesi* because if he would like to make use of his property in the vicinity of the karst formations occurring on his land, he must now choose between risking an enforcement action against him by USFWS or a private party should an impermissible take occur, bearing the cost of seeking an incidental take permit from the USFWS, or bearing the cost of compliance with state and/or local measures that have been approved by USFWS as avoiding take.  Plaintiff Harrison is a member of the American Stewards of Liberty.  If Defendants were enjoined from violating the ESA and APA, the harm to the interests of Plaintiff Harrison caused by Defendants' actions would likely be eliminated, thereby redressing his economic injuries.  This is because Defendants likely would proceed with delisting *Texella reyesi*.

12.     Defendant Department of the Interior is an agency of the United States charged with administering the ESA for non-marine species.

13.     Defendant the Honorable Sally Jewell (hereafter, "Secretary") is being sued in her official capacity as Secretary of the United States Department of the Interior.  Congress delegates to the Secretary certain responsibilities for the Department of the Interior's implementation and administration of the ESA.  The Secretary's responsibilities include

administering the ESA for the benefit of species and the public.  The Secretary is required to ensure proper responses to petitions filed under 16 U.S.C. § 1533(b)(3)(A) to delist species.

14.     Defendant USFWS is an agency within the Department of the Interior which has the delegated responsibilities of administering and implementing the ESA, including provisions concerning responses to petitions filed under 16 U.S.C. § 1533(b)(3)(A) to delist species.

15.     Defendant Daniel M. Ashe (hereafter, "Director") is being sued in his official capacity as Director of the USFWS.  The Secretary delegates most of her ESA authority to the Director, who is responsible for responses to petitions filed under 16 U.S.C. § 1533(b)(3)(A) to delist species.

16.     Defendant Benjamin Tuggle is being sued in his official capacity as the Southwest Regional Director (hereafter, "Regional Director") of the USFWS.  The Director delegates most of his authority under the ESA to the Regional Director.  The Regional Director is responsible for responding to petitions filed in the Southwest Region under 16 U.S.C. § 1533(b)(3)(A) to delist species.

## IV.  GENERAL ALLEGATIONS AND STATUTORY FRAMEWORK

17.     Congress enacted the ESA "to provide a program for the conservation of . . . endangered species and threatened species."  16 U.S.C. § 1531(b).

18.     As part of the ESA, Defendants have the statutory authority to list a species as either endangered or threatened when specific criteria are met.  *See* 16 U.S.C. § 1533(a)(1).  The term "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife."  16 U.S.C. § 1532(16).

19.     Defendants are required to make listing determinations "solely on the basis of the best scientific and commercial data available to [them] after conducting a review of the status of the species." 16 U.S.C. § 1533(b)(1)(A).

20.     "To the maximum extent practicable, within 90 days after receiving the petition of an interested person . . . to remove a species from" the list of threatened and endangered species, Defendants must "make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A).

21.     USFWS regulations define "substantial information" as "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. § 424.14(b)(1).

22.     Should USFWS find that the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted, then, within 12 months after receiving a petition, Defendants must "promptly commence a review of the status of the species concerned," and "promptly publish each finding made under this subparagraph in the Federal Register." 16 U.S.C. §§ 1533(b)(3)(A)–(B). This "12-month" review is a more thorough review than the 90-day finding and is not constrained to the petition.

23.     Every five years, independently of the process for citizen-submitted petitions, the Secretary must conduct a status review of each listed species to determine whether a change in the species' listing status is warranted. 16 U.S.C. § 1533(c)(2)(A). On the basis of that so-called Five-Year Status Review, the Secretary must determine whether any such species should—

(i)     be removed from such list;

(ii)     be changed in status from an endangered species to a threatened species; or

(iii)    be changed in status from a threatened species to an endangered species.

*Id.* § 1533(c)(2)(B).

24.     The standards for delisting a species are the same as those for listing a species. 50 C.F.R. § 424.11(d).

25.     In 1988, USFWS made largely unsupported assumptions as to *Texella reyesi*'s rarity and listed the species as endangered.  53 Fed. Reg. 36,029 (Sept. 16, 1988).  Since *Texella reyesi*'s listing in 1988, the number of caves identified as inhabited by *Texella reyesi* has increased more than thirty-fold, from five to 172.  As scientists gather additional data, the rarity theorized by the USFWS in 1988 has been shown to be in error.  Furthermore, significant conservation measures are in place, with at least 94 of the sites occupied by *Texella reyesi* (or 55 percent of the total known sites) currently protected in preserves, parks, or other open spaces.

26.     Biologists continue to discover new occupied sites, a trend likely to continue as more areas are explored and more caves are discovered.  New information indicates that *Texella reyesi* inhabits not just caves that humans can access, but tiny cracks and voids of all sizes in the limestone substrate of Travis and Williamson counties north of the Colorado River. This same information indicates that development activities on the surface are not as detrimental to *Texella reyesi* as the USFWS originally assumed.

27.     *Texella reyesi* lives successfully in the Inner Space Caverns, a heavily-visited recreational attraction located under an Interstate Highway, as well as in dozens of other well-known caves surrounded by development.  In addition, state and local ordinances already protect most caves in Travis and Williamson counties (e.g., City of Austin Environmental Criteria Manual, City of Georgetown Resolution No. 122013-C, Texas Commission on

Environmental Quality's ("TCEQ") Edwards Aquifer Rules, and the TCEQ Texas Pollution Discharge Elimination System).

28.      Since listing *Texella reyesi* over 27 years ago, the USFWS assumed that surface disturbance above a void or cave caused destruction of the subsurface ecosystem.  During all of the intervening years, the USFWS required and currently requires that development be severely restricted in the vicinity of caves occupied by *Texella reyesi*.  In fact, under the Williamson County Regional Habitat Conservation Plan, landowners must pay up to $400,000 to develop within 50 feet of an occupied cave footprint and $10,000 an acre to develop within 50 feet to 375 feet of an occupied cave footprint.  These measures have been approved by USFWS as sufficient to compensate for any take that may occur.

29.      Dozens of projects under active construction, including important public works projects, have been put on hold, sometimes for weeks, with contractors and equipment idled, so that biologists could conduct surveys for *Texella reyesi* and coordinate with USFWS staff.

## V.  FACTUAL ALLEGATIONS REGARDING THE BONE CAVE HARVESTMAN (*TEXELLA REYESI*) REGULATORY STATUS AND ITS IMPACT ON PLAINTIFFS AND THE STATE OF TEXAS

30.      In 1988, Defendants listed *Texella reyesi* as a federally protected endangered species.  The USFWS first listed *Texella reyesi* as endangered under the ESA in 1988 under the incorrect identification of Bee Creek Cave harvestman (*Texella reddelli*).  53 Fed. Reg. 36,029 (Sept. 16, 1988).

31.      On September 6, 1988, the USFWS published a final rule to list as endangered five species of karst invertebrates known to occur only in Travis and Williamson counties, Texas.  53 Fed. Reg. 36,029 (Sept. 16, 1988).  This final rule, which became effective on the date of publication, extended ESA protections to the *Texella reddelli*, among other karst invertebrates.

32.     In support of the 1988 final listing rule, the USFWS relied on only seven referenced data sources to substantiate the listing of the *Texella reddelli* and the other species. Of these sources, only one (Goodnight & Goodnight 1967) had any reference specific to *Texella reddelli*. In the final rule, *Texella reddelli* was confirmed from only five caves and was believed to exist, but was not confirmed, in a sixth. The known range of the species extended a distance of approximately 21 miles along the edge of the Edwards Plateau (75 square miles). The USFWS decision to list *Texella reddelli* (later corrected to include both *Texella reddelli* and *Texella reyesi*) was based on very limited information about the species (including basic taxonomy) and was prompted by concerns about potential adverse effects of development activities at a time when the link between such activities and actual effects on the species was unknown.

33.     In response to a published taxonomic study by Ubick and Briggs in 1992, the USFWS determined in 1993 that *Texella reddelli* was actually comprised of two distinct species. 58 Fed. Reg. 43,818 (Aug. 18, 1993). The newly identified species, *Texella reyesi*, was afforded the same protections under the ESA as *Texella reddelli*. The USFWS published a "technical correction," which states that "both of these species continue to face the same general threats identified in the original listing of the Bee Creek Cave harvestman [*Texella reddelli*]." 58 Fed. Reg. 43,818 (Aug. 18, 1993). The USFWS acknowledged that by "including newly discovered localities" of the *Texella reyesi*, the known range of the species expanded from 21 miles to 31 miles along the edge of the Edwards Plateau.

34.     In the 1993 technical correction, the omission of any assessment of available substantive scientific data beyond Ubick and Briggs (1992) was an oversight of substantial significance to the actual appropriateness of the listing. At the time the final rule was published,

progress was well underway toward developing the 1994 Endangered Karst Invertebrates (Travis and Williamson counties, Texas) Recovery Plan (1994 Recovery Plan). The 1994 Recovery Plan (which addresses *Texella reyesi* and six other ESA-listed karst invertebrates) includes an extensive nine-page list of references, including 32 publications and reports relevant to *Texella reyesi*. None of these sources were explicitly considered in the technical correction extending protections of the ESA to *Texella reyesi*. This means that at the time of the 1993 technical correction, a substantial body of new information was available to the USFWS that was not considered or analyzed in the technical correction listing *Texella reyesi*, demonstrating that the decision was not based on the best available scientific data available at the time.

35.     *Texella reyesi* remains listed as an endangered species, creating significant costs for people and businesses throughout Williamson and Travis counties, Texas, including Plaintiffs.

36.     Because the best scientific evidence demonstrates that the *Texella reyesi* is not an endangered species or subspecies, and because of the significant costs associated with the regulatory status of *Texella reyesi* as an endangered species, Plaintiffs petitioned Defendants, under 16 U.S.C. § 1533(b)(3)(A), to remove the *Texella reyesi* from the list of endangered species.

37.     In 2009, fifteen years after the release of the 1994 Recovery Plan, the USFWS completed a 5-year status review of *Texella reyesi* and, in spite of new data documenting the increased number of protected locations for the species, arbitrarily determined that no change in listing status was warranted. The 2009 status review does not evaluate any of the ESA listing factors and provides no analysis of any new scientific or commercial data in relation to those factors. While it does confirm that, as of 2009, there were 168 known occupied caves

containing *Texella reyesi* distributed across all Karst Fauna Regions ("KFRs"), a substantial increase beyond those known at the time of the 1994 Recovery Plan and a 30-fold increase over those known at the time of listing, it does not evaluate the implications of these additional known sites for the species' risk of extinction.

38.     Since its listing in 1988, a significant amount of new scientific and commercial information has become available, demonstrating not only that *Texella reyesi* is a distinct species, but that *Texella reyesi* occurs in significantly more locations than originally believed. Given the vastly increased number of known sites occupied by the species, many of which are protected, the threats to the species are not of a magnitude or intensity likely to cause the extinction of the species now or in the foreseeable future.  The circumstances of *Texella reyesi* are similar to those in the examples below, where the consideration of new populations or occupied sites prompted the USFWS to delist various species.  Like the Utah Valvata snail (described below), *Texella reyesi* possesses the ability to persist and thrive in conditions where the USFWS assessment of threats normally indicates a decline or extirpation.  These examples support the conclusion that the protections of the ESA are not warranted for *Texella reyesi* since the existence or magnitude of threats to the species, or both, do not support a conclusion that the species is at risk of extinction now or in the foreseeable future.

- **Pine Barrens treefrog *(Hyla andersonii)* (48 Fed. Reg. 52,740)** – In 1983, the Florida population of the Pine Barrens treefrog was delisted due to a finding that the original data was in error.  The USFWS stated, "recent evidence indicates that the species is much more widely distributed than originally known."  At the time of the listing, there were only seven known localities of this species in Florida, and the predominant threat was cited as "the present or threatened modification, or curtailment of its habitat or range."  By 1979, several

more populations were identified, and by 1980 there were over 150 confirmed occupied locations for the species (an increase of at least 2,042%). The final rule noted that while the overall distribution of the species was relatively limited, the likelihood of discovering more known localities in consideration with the additional new sites discovered indicated that "the Florida population is relatively secure for the immediate future."

- **Rydberg Milk-Vetch (*Astragalus perianus)* (54 Fed. Reg. 37,911) –** In 1989, the Rydberg milk-vetch was delisted on the basis of erroneous data. At the time when this species was listed, there was only one known locality. The subsequent delisting was based on the discovery of 11 additional localities over nine years of research (an increase of 1,100%). This delisting was supported by the existence of regulatory mechanisms that minimized the impacts of the threats identified in the initial listing factors.

- **McKittrick pennyroyal *(Hedeoma apiculatum)* (58 Fed. Reg. 49,244)** – In 1993, the McKittrick pennyroyal was delisted because of "the number of newly discovered populations and the remote and inaccessible nature of the habitat." This species was known from only two counties at the time of listing and continues to be only known from two counties, one each in Texas and New Mexico. At the time of listing, there were seven known localities of the species. At the time of delisting, there were 36 known populations of the species (an increase of 414%). The USFWS determined that since this plant species occurs in hard-to-reach habitats, it is likely that its distribution is even broader than the confirmed locations and that its naturally preferred habitat limits the likelihood of human-related impacts.

- **Utah (Desert) Valvata snail *(Valvata utahensis)* (75 Fed. Reg 52,272)** – In 2010, the Utah Valvata snail was delisted on the basis of new information. At the time of listing in 1992, the species was believed to occur in only "a few springs and mainstem Snake River sites" at

isolated points along the Snake River.  The species was delisted after data showed that the species range extended an additional 122 miles beyond the initially identified range (an increase in the known range of 118.5%).  The USFWS determined that due to the increased range of the species, the listing factors would not contribute to the likelihood of the species being threatened with extinction in the foreseeable future.  Among the threats discussed, impacts to its habitat from agricultural and industrial purposes were excluded as threats because "the species persists in these varied mainstem Snake River systems, including impounded reservoir habitats."  75 Fed. Reg. at 52,280.  This distinction is critical because, despite the continued presence of previously perceived threats, the proven ability of the species to continue to thrive in conditions otherwise considered a threat supported delisting.

- **Tennessee cave beetles (80 Fed. Reg. 60,834) –** Very recently, the USFWS published a "Notice of 12-Month Petition Findings" concluding that listing six cave-dwelling beetle species was not warranted.  The beetles vary in rarity— 2013–2015 survey results indicated that four of the beetle species are known from only one or two locations, and the most "plentiful" of the six beetle species was known to occur in potentially five caves.  The USFWS also identified water quality impacts, erosion resulting construction, livestock operations, human visitation of caves, curtailment of organic materials to caves, excavation of cave habitats, and predation as stressors to the beetle species.  Despite their apparent rarity and the noted stressors, the USFWS concluded that the actual impacts from potential stressors to the beetles appear to be minimal.  In reaching its conclusion, the USFWS stated that "[t]he recent evidence of continued persistence of these species, in conjunction with the lack of evidence that stressors are negatively affecting these cave beetles, lead us to conclude that these species are more stable than previously thought."

39.     The Delisting Petition documents more than 165 identified localities at which *Texella reyesi* occurs in addition to those known at the time of listing.   The Delisting Petition also provides data demonstrating that *Texella reyesi*'s resilience to human activities is stronger than the USFWS had originally determined at the time of listing.   The Delisting Petition includes scientific support showing:

- Known localities have increased from five or six at the time of listing to 172 today.

- Significant conservation is in place with at least 94 total known localities (55 percent of the total known localities) currently protected in preserves, parks, or other open spaces.   There are more than an order of magnitude more **protected** localities than total **known** localities at the time of the listing.

- Regulatory protections are afforded to most caves in Travis and Williamson counties via state laws and regulations and local ordinances.   These protections are either specific to *Texella reyesi* or have a collateral protective effect for *Texella reyesi*.

- Biologists continue to discover new, occupied localities, a trend likely to continue as more areas are explored and more caves are discovered.

40.     The Delisting Petition also contains a review of the ESA listing factors and supports the idea that surface development activities may not result in significant loss or degradation of the subsurface habitat for *Texella reyesi* as originally thought, by providing several examples, including the Inner Space Caverns, which demonstrate that the species can persist in caves with frequent human visitation and may be more tolerant of related habitat modifications than originally believed.   Additionally, recent studies suggest that fire ants may not present as significant or as lasting of a threat to the species as originally believed.   Moreover, the regulatory landscape includes a number of measures contributing to the

conservation of the species beyond the protections afforded by the ESA.  Finally, the use of small voids, or "mesocaverns," within the geologic formations known to support occupied caves mitigates the potential threat of climate change.

41.     The Delisting Petition concludes that delisting *Texella reyesi* is warranted because the listing was clearly in error as to the perceived rarity and known extent of *Texella reyesi* and on the basis of both: (1) significant conservation and regulatory efforts protective of the species; and (2) information and analysis indicating the existence and/or magnitude of previously identified threats do not support a conclusion that the species is at risk of extinction now or in the foreseeable future.

42.     On April 15, 2015, over 10 months after the Plaintiffs submitted the Delisting Petition, rather than providing a finding on the Delisting Petition, the USFWS announced that it would be conducting a five-year review of *Texella reyesi* under the process set forth in 50 C.F.R. § 424.21.  80 Fed. Reg. 20,241 (Apr. 15, 2015).

43.     Despite the scientific support set forth in the Delisting Petition, on June 1, 2015, a full year after the Plaintiff submitted the Delisting Petition, the USFWS announced its Negative Finding, concluding that the Delisting Petition did not present substantial information indicating that the petitioned action may be warranted.  80 Fed. Reg. 30,990.  The USFWS identified its charge as follows: "We must consider [the five listing factors] in delisting a species.  We may delist a species according to 50 CFR 424.11(d) if the best available scientific and commercial data indicate that the species is neither endangered nor threatened for the following reasons: (1) the species is extinct; (2) the species is recovered; or (3) the original data for classification were in error."  80 Fed. Reg. at 30,991.

44.    In its Negative Finding, the USFWS wholly failed to analyze the original error in classification made in the 1988 listing and only briefly noted the technical correction that was required to actually list *Texella reyesi* due to the original listing's taxonomic error.  80 Fed. Reg. at 30,991.

45.    Instead, in its Negative Finding, the USFWS noted:

- "[T]he petition states that 94 karst preserve areas are currently providing significant conservation.  However, many of the existing protected areas referenced in the petition are too small to meet our preserve design recommendations….[A]t most of the remaining locations…we are lacking information to confirm that they meet the preserve design criteria….Hence, we are unsure whether those areas have adequate undeveloped acreage, management, or protection mechanisms to ensure the long-term protection and survival of the Bone Cave harvestman."  80 Fed. Reg. at 30,993.

- "The petition asserts that four additional locations are known since the time of the 5-year review.  However, the petition does not provide adequate information that would support whether these four additional locations are in a condition to meet preserve design recommendations….Regardless, the amount of protected karst fauna area still falls short of the criteria for reclassification from endangered to threatened."  80 Fed. Reg. at 30,993.

- "The current petition asserts that 'Development activities on the surface may not result in the significant loss or degradation of habitat for *Texella reyesi* as originally thought' and suggests that evidence of this is the species persistence in caves surrounded by developed areas….However, the observation of the species in these locations does not mean their populations at these locations are thriving or can withstand the long-term impacts from development activities that are expected to occur….Information adequate to detect population trends for this species is not readily available and was not provided in the petition."  80 Fed. Reg. at 30,993.

- "The commercial cave known as Inner Space Caverns is another example the petition provided where the Bone Cave harvestman continues to persist in a developed area. Although the Bone Cave harvestman may be present at Inner Space Caverns, this does not ensure their populations are robust and secure; they may still be declining, and are at risk due to competition with surface-dwelling invertebrates and other threats associated with development such as the potential for contamination….The petition failed to provide any data adequate to assess trends in the karst invertebrate population in relation to the time (duration and frequency) that they have been exposed to the artificial lighting."  80 Fed. Reg. at 30,994.

- "While the petition did discuss some new ordinances that appear to have been put in place since the time of listing, we do not have enough information to indicate whether or not these State and local ordinances provide enough protection from all threats to the Bone Cave harvestman."  80 Fed. Reg. at 30,995.

- "The petition provided no trend analysis to indicate that this species can withstand the threats associated with development or climate change over the long term." 80 Fed. Reg. at 30,996.

46.    USFWS' Negative Finding applied a more stringent standard than the "reasonable person" standard required by its own regulations.  USFWS erroneously placed the burden on the Delisting Petition to demonstrate satisfaction of the Recovery Plan objectives for a species that was clearly listed in error and which is far more widespread and enjoys for more protections than six species (e.g., Tennessee cave beetles) USFWS recently determined not to list at all.  Thereby applying standards for delisting applicable when a species has recovered, rather than the standards appropriate when the original listing was made in error.

47.    The USFWS approved survey procedures for *Texella reyesi* are costly and require a landowner to retain a USFWS licensed biologist to conduct the surveys.  Landowners whose property falls within the known habitat range of *Texella reyesi* who are unsure of whether or not their property contains occupied *Texella reyesi* habitat face an illusory choice.  Such a property owner may either simply abandon or avoid certain parts of their property containing karst formations that may be occupied.  Alternatively, if such a property owner wishes to use portions of their property that include karst formations, the property owner may do so and risk an enforcement action for civil or criminal penalties brought by either the USFWS or a third party if any take of *Texella reyesi* occurs.  If the property owner both wishes to use their property and to avoid potential criminal or civil penalties, the property owner would face the economic choice between complying with the costly measures approved by USFWS as avoiding take of *Texella reyesi* (such as the TCEQ's Optional Enhanced Measures for the Protection of Water Quality in the Edwards Aquifer and Related Karst Features that May Be Habitat for Karst Dwelling Invertebrates), or the costly and time-intensive proposition of applying to USFWS for an incidental take permit.

# VI.  SPECIFIC ALLEGATIONS THAT SUPPORT DECLARATORY AND INJUNCTIVE RELIEF

48.     Plaintiffs hereby reallege and reassert the allegations contained in Paragraphs 1 through 47 as though fully set forth herein.

49.     An actual and substantial controversy exists between Plaintiffs and Defendants over Defendants' duty to comply with the ESA and APA in making a finding as to whether Plaintiffs' *Texella reyesi* Delisting Petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). Plaintiffs contend that Defendants have violated the ESA and APA by: (1) failing to recognize the original classification error, as mandated by 50 C.F.R. § 424.11(d); (2) failing to limit their review of scientific and commercial data to the Delisting Petition and instead improperly attempting to gather additional, external information through a newly-announced five-year status review;[1] (3) applying the wrong evidentiary standard and failing to apply the "substantial information" standard; and (4) ignoring, misconstruing, and/or subverting scientific information.

50.     This case is currently justiciable because Defendants have failed to follow the ESA and its implementing regulations in determining whether Plaintiffs' *Texella reyesi* Delisting Petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted."  16 U.S.C. § 1533(b)(3)(A).

51.     Declaratory and injunctive relief is, therefore, appropriate to resolve this controversy.

---

[1] Plaintiffs recognize that USFWS and the National Marine Fisheries Services ("NMFS") have proposed amendments to their listing regulations that would clarify that USFWS and NMFS may consider, in addition to the petition, information that is readily available in the relevant agency's possession at the time it makes a 90-day finding.  81 Fed. Reg. 23,448, 23,451 (April 21, 2016). The proposed amendments do not go so far as to expand the USFWS' scope of review to include the solicitation of additional information at the 90-day stage.

## VII.  FIRST CLAIM FOR RELIEF

**(Violation of the ESA, 16 U.S.C. § 1533(b)(3)(A),**
**Failure To Comply with the ESA in Reaching a 90-day Determination on a Petition To Delist a Species)**

52.     Plaintiffs reallege and reassert Paragraphs 1 through 51 as though set forth in full in each and every allegation of this claim.

53.     Defendants have a mandatory and nondiscretionary duty under the ESA to make a finding on a petition to delist a species by indicating, to the maximum extent practicable, within 90 days whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted."  16 U.S.C. § 1533(b)(3)(A).

54.     Although Defendants made a finding with regard to the Delisting Petition, Defendants exceeded their regulatory authority in determining whether the Delisting Petition presented substantial information that the petition action may be warranted by: (1) failing to recognize or analyze the original classification error, as mandated by regulation; (2) failing to limit review of the Delisting Petition and instead improperly attempting to gather additional, external information through a newly-announced five-year status review; (3) applying the wrong standard for whether a species warrants delisting and failing to apply the "substantial information" standard; and (4) ignoring, misconstruing, and/or subverting scientific information in violation of the ESA.

55.     In so doing, the Defendants failed to apply the correct standards when making a discretionary determination under the ESA, thereby failing to proceed in the manner required by law, abusing their discretion, and making a determination that is both arbitrary and capricious.

## VIII.  SECOND CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), Unlawful Agency Action)

56.     Plaintiffs reallege and reassert Paragraphs 1 through 55 as though set forth in full in each and every allegation of this claim.

57.     Defendants have a mandatory and nondiscretionary duty under the ESA to make a finding on a petition to delist a species by indicating within 90 days, to the maximum extent practicable, whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted."  16 U.S.C. § 1533(b)(3)(A).

58.     Defendants exceeded their regulatory authority in determining whether the Delisting Petition presented substantial information that the petitioned action may be warranted. In making its Negative Finding, the USFWS was arbitrary, capricious, abused its discretion and acted contrary to law by failing to follow its own guidelines, applying an improper standard to determine whether delisting was warranted, and wholly failing to analyze whether the original listing decision was made in error.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment from this Court as follows:

1.     Declare Defendants violated the ESA and APA when determining whether Plaintiffs' *Texella reyesi* Delisting Petition "presents substantial scientific or commercial information indicating that" delisting of the *Texella reyesi* may be warranted;

2.     Set aside the Negative Finding;

3.     Direct Defendants to remedy the violations of the ESA and APA;

3.     Retain jurisdiction over this matter until such time as Defendants have fully complied with the ESA and APA;

4.      Award Plaintiffs costs of litigation pursuant to 16 U.S.C. § 1540(g)(4) or, in the alternative, 28 U.S.C. § 2412; and

5.      Grant Plaintiff an award of any additional relief that the Court deems just and proper under the circumstances of this case.


Dated:  June 28, 2016

                              Respectfully submitted,

                              NOSSAMAN LLP


                    By:     */s/ Paul S. Weiland*            
                            Paul S. Weiland (CA Bar No. 237058)
                            pweiland@nossaman.com
                            *Admitted to Practice in USDC, W.D. Tex.*
                            NOSSAMAN LLP
                            18101 Von Karman Avenue, Suite 1800
                            Irvine, CA 92612
                            Telephone:     949.833.7800
                            Facsimile:      949.833.7878

                            Alan M. Glen (TX Bar No. 08250100)
                            aglen@nossaman.com
                            Brooke M. Wahlberg (TX Bar No. 24055900)
                            bwahlberg@nossman.com
                            NOSSAMAN LLP
                            816 Congress Avenue, Suite 970
                            Austin, TX  78701
                            Telephone:     512.651.0660
                            Facsimile:      512.651.0770

                            *Attorneys for Plaintiffs*
                            *American Stewards of Liberty; Charles and Cheryl*
                            *Shell; Walter Sidney Shell Management Trust;*
                            *Kathryn Heidemann; and Robert V. Harrison, Sr.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2016, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system which will send notification of such filing to the following:

Robert E. Henneke
rhenneke@texaspolicy.com
Chance D. Weldon
cweldon@texaspolicy.com
Texas Public Policy Foundation
Center for the American Future
901 Congress Avenue
Austin, TX 78701
Tel:    512.472.2700
Fax:    512.472.2728
*Attorneys for Intervenor-Plaintiffs*

Jeremey Hessler
jeremy.hessler@usdoj.gov
Lesley K. Lawrence-Hammer
lesley.lawrence-hammer@usdoj.gov
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, DC 20044-7611
Tel:    202.305.0217
Fax:    202.305.0275
*Attorneys for Federal Defendants*

                                    */s/ Paul S. Weiland*
                                    Paul S. Weiland