IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| AMERICAN STEWARDS OF | § | |
| LIBERTY, *et al.* | § | |
|     *Plaintiff*, | § | |
| | § | CIVIL ACTION NO. 15-cv-1174-LY |
| v. | § | |
| | § | |
| UNITED STATES FISH & WILDLIFE | § | |
| SERVICE, *et al*. | § | |
|     *Defendants*. | § | |

**INTERVENOR-PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

MEMORANDUM IN SUPPORT OF INTERVENOR PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ...................................................................2

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ......................................2

II.     LEGAL BACKGROUND .................................................................................5

        A.      Endangered Species Act ............................................................5

        B.      The Commerce Clause and Necessary Proper Clause ................5

III.    STATEMENT OF FACTS ...............................................................................7

        A.      Regulatory History of the BCH ..................................................7

        B.      Injuries Sustained by Intervenors Due to the Continued Listing of the BCH .......................................................................9

                a.      John Yearwood ...............................................................9

                b.      Williamson County, Texas...........................................10

IV.     JURISDICTION AND STANDARD OF REVIEW ............................................12

V.      THE LEGAL FRAMEWORK HAS CHANGED SINCE *GDF REALTY I* WAS DECIDED ....................................................................................................13

        A.      Background of *GDF Realty I* ..................................................15

        B.      The Supreme Court Decided Post-*GDF Realty I* that the Third Lopez Category Should Be Interpreted Under the Necessary and Proper Clause .....................................................................................17

VI.     REGULATION OF BCH IS NOT PERMITTED UNDER THE NECESSARY AND PROPER CLAUSE ................................................................................19

        A.      Regulation of the Take of the BCH Is Not an Essential Part of the ESA .....................................................................................20

        B.      Regulation of the Take of the BCH, a Noneconomic, Intrastate Species, Is Not a Proper Means for Executing the ESA Because It Substantially Expands Federal Authority .......................................23

VII.    CONCLUSION.............................................................................................24

i

To the Honorable Lee Yeakel, United States District Judge:

COME NOW, Intervenor-Plaintiffs John Yearwood and Williamson County, Texas, to file this Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Intervenor-Plaintiffs respectfully move this Court for an order granting summary judgment.  Intervenor-Plaintiffs have concurrently filed a memorandum in support of this motion, declarations, and a proposed order granting Intervenor-Plaintiff's Motion for Summary Judgment.  This motion is made on the grounds that no triable issue of material fact exists regarding the issue of whether the Defendants United States Fish & Wildlife Service, et al. has the authority to regulate takes of the Bone Cave Harvestman "("BCH"), a subterranean arachnid.  As to this issue, Defendant does not have authority to regulate BCH takes because the BCH is not bought or traded in interstate commerce and does not otherwise affect interstate commerce.  Regulating takes of a wholly intrastate species exceeds Congress's authority pursuant to the Commerce Clause.  On these bases, Intervenor-Plaintiffs are entitled to judgment as a matter of law.  Intervenor-Plaintiffs' Motion for Summary Judgment is based on the pleadings and papers filed in this action and this motion, as well as the accompanying memorandum, declarations, and any additional response, evidence, or argument that counsel will make at or before the hearing.

**MEMORANDUM IN SUPPORT OF INTERVENOR-PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

## I.       INTRODUCTION AND SUMMARY OF ARGUMENT

The issue before this Court is whether the Commerce Clause authorizes the federal government, pursuant to the Endangered Species Act ("ESA"), to regulate the Bone Cave Harvestman ("BCH")—a tiny subterranean arachnid that only exists in two central Texas counties, is not bought or traded in interstate commerce, and does not otherwise affect interstate commerce.  This Court and the U.S. Court of Appeals for the Fifth Circuit previously found such regulation to be Constitutional in *GDF Realty Investments, Ltd. v. Norton*, 326 F.3d 622, 640 (5th Cir. 2003) (hereinafter *GDF Realty I*) However, *GDF Realty* was decided prior to the Supreme Court's decisions in *Gonzales v. Raich*, 545 U.S. 1 (2005), and *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012), as well as the Fifth Circuit's decision in *United States v. Whaley*, 577 F.3d 254 (5th Cir. 2009). This trio of cases altered the applicable test for evaluating regulations of intrastate activity from a pure Commerce Clause analysis to an analysis where the Commerce clause is viewed through the Necessary and Proper Clause.

Under the Necessary and Proper Clause, regulating takes of wholly intrastate, noneconomic species exceeds Congress's authority under the Commerce Clause.  Indeed, the only court to examine the constitutionality of listing intrastate species under the ESA post-*Raich, Sebelius,* and *Whaley* found the practice unconstitutional.  *See People for Ethical Treatment of Prop. Owners v. U.S. Fish and Wildlife Serv.*, 57 F. Supp. 3d 1337, 1344 (D. Utah 2014) (hereinafter *PETPO*).   A reexamination by this Court of the government's regulation of BCH takes under the ESA is therefore proper.

At the time that *GDF Realty* was decided, the Fifth Circuit still applied rational basis scrutiny to Commerce Clause claims. *See GDF Realty*, 326 F.3d at 627.  Applying that deferential standard of review, the court found that regulating BCH takes was rationally related to the regulation of interstate commerce because all species are "interdependent." *Id*. at 640. Put simply, without any evidence, the Court concluded that extinction of the BCH would affect all species and, therefore, substantially affect interstate commerce. *See id.*

Even if the *GDF Realty* panel's decision could have been maintained under the rational basis standard applied to Commerce Clause challenges at the time—a notion fiercely rejected, even then, by 6 members of the Fifth Circuit[1]—it is unsustainable under the more rigorous Necessary and Proper Clause standard that must be applied now.  The Necessary and Proper Clause requires that regulations be (1) "narrow in scope," (2) "incidental" to the regulation of commerce, and (3) cannot "work a substantial expansion of federal authority."  *Sebelius*, 132 S. Ct. at 2592, 2627.  The *GDF Realty I* court's ecosystem-equals-commerce approach to federal regulatory authority simply cannot survive this heightened standard of review. *See PETPO*, 57 F. Supp. 3d at 1344 ("The Commerce Clause empowers Congress 'to regulate commerce' not 'ecosystems.'"). If Congress could use the Commerce Clause "to regulate anything that might affect the ecosystem (to say nothing about its effect on commerce), there would be no logical stopping point to congressional power." *Id.*

---

[1] *GDF Realty Investments, Ltd. v. Norton*, 362 F.3d 286, 287 (5th Cir. 2004) (dissenting from the denial of a petition for rehearing en banc).  "[f]or the sake of species of 1/8-inch-long cave bugs, which lack any known value in commerce, much less interstate commerce, the panel crafted a constitutionally limitless theory of federal protection."

3

The Administrative Procedures Act ("APA") requires final agency actions (like the Service's continued assertion of jurisdiction over BCH takes and its continued failure to delist the BCH[2]), to be declared invalid if they are (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, (b) contrary to any constitutional right, power, privilege, or immunity, (c) inconsistent with any statute, (d) adopted without compliance with required procedures, (e) unsupported by substantial evidence, or (f) unwarranted by the facts (if reviewed de novo). 5 U.S.C. § 706. Intervenors challenge the Service's continued assertion of authority over BCH takes and its failure to delist the species as not in accordance with law and contrary to constitutional right, power, privilege, or immunity because it exceeds the federal government's authority under the Commerce and Necessary and Proper Clauses. For the reasons that follow, this Court should declare the continued listing of the species invalid under the APA and enjoin its enforcement.

In the alternative, the Court should declare the Service's continued assertion of authority over BCH takes and the its failure to delist the species invalid under the Tenth Amendment. The Tenth Amendment protects both states and individuals from actions taken by the federal government in excess of its enumerated powers. *Bond v. United States*, 131 S. Ct. 2355, 2365 (2011). This Court should declare the Service's continued assertion of authority over BCH takes and its failure to delist the species invalid and enjoin its enforcement under the Tenth Amendment as exceeding the federal government's powers under the Commerce and Necessary and Proper Clauses.

---

[2] Both evidenced by the Service's most recent negative 90 day finding.  *See* 80 Fed. Reg. 30,996.

4

## II.    LEGAL BACKGROUND

### A.  Endangered Species Act

The ESA was adopted in 1973 in an effort to protect species threatened with extinction.  *See* H.R. Rep. No. 93-412, at 4-5 (1973).  Through implementation of the ESA, Congress prohibited takes of certain endangered and threatened species.  *See* 16 U.S.C. § 1538(a)(1)(B); *see also* 50 C.F.R. § 17.21(c) (2016) (discussing endangered species takes).  A "take" is broadly defined as harassing, harming, pursuing, hunting, shooting, wounding, killing, trapping, capturing, or collecting, or attempting to engage in any such conduct.  *See* 16 U.S.C. § 1532(19).

The designation of a species as endangered or threatened forces property owners to seek permits from the United States Fish & Wildlife Service ("Service") for approval of activities that could potentially disturb the species.  *See* 16 U.S.C. § 1539(a) (discussing permitting provisions).  Consequences of an unauthorized take include civil and criminal penalties, including fines of up to $50,000 and imprisonment for up to one year.  *See* 16 U.S.C. § 1540.

### B.  The Commerce Clause and Necessary and Proper Clause

The Constitution empowers Congress to "regulate Commerce . . . among the several States."  U.S. CONST. art. I, § 8, cl. 3.  "The commerce power 'is the power to regulate; that is, to prescribe the rule by which commerce is to be governed.'"  *Lopez*, 514 U.S. at 553 (citing *Gibbons v. Ogden,* 9 Wheat. 1, 189–190, 6 L.Ed. 23 (1824)).  The Commerce Clause provides Congress with the authority to regulate (1) "the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce"; and (3) "those activities having a substantial relation to interstate commerce . . . i.e., those activities that

substantially affect interstate commerce." *Id.* at 558-59.  The first two *Lopez* categories do not apply to this case, and Congress's power to regulate BCH takings can only be found under the third *Lopez* category.  *See GDF Realty I*, 326 F.3d at 628; *see also PETPO*, 57 F. Supp. 3d at 1344.

At the time that *GDF Realty I* was decided by the Fifth Circuit, the court still applied a traditional rational basis Commerce Clause analysis to claims arising under the third *Lopez* factor.  *See GDF Realty I*, 326 F.3d at 627.  Since that time, the Supreme Court and the Fifth Circuit have held that the third *Lopez* category is not properly interpreted under the Commerce Clause, but instead falls under the Necessary and Proper Clause, which requires a higher level scrutiny than rational basis.  *See Raich*, 545 U.S. at 35-37 (Scalia, J., concurring); *see also Sebelius*, 132 S. Ct. at 2591-92; *Whaley*, 577 F.3d. at 260.

The Necessary and Proper Clause authorizes Congress to "make all Laws . . . necessary and proper" to execute the powers enumerated in the Constitution.  U.S. CONST. art. I, § 8, cl. 18.  With respect to the nexus between the Commerce Clause and the Necessary and Proper Clause, the Supreme Court concluded in *Raich* that Congress has the power to "make all Laws which shall be necessary and proper to regulate Commerce among the several States."  *Raich*, 545 U.S. at 22 (internal quotation marks omitted).

Unlike rational basis scrutiny, analysis under the Necessary and Proper Clause requires that regulations be "plainly adapted" to the execution of an enumerated power and consistent "with the letter and spirit of the constitution."  *Sebelius*, 132 S. Ct. at 2579.  A regulation is "plainly adapted" if it is: (1) "narrow in scope," (2) "incidental" to the

regulation of commerce, and (3) does not "work a substantial expansion of federal authority" *Id.* at 2592.  Even those laws that are determined to be "necessary" may be unconstitutional if they are not "proper [means] for carrying into Execution" Congress's enumerated powers.[3]  *Id.*  An interpretation of Congress's authority under the Commerce Clause that would "effectually obliterate the distinction between what is national and what is local and create a completely centralized government" cannot be sustained. *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937).

## III.    STATEMENT OF FACTS

### A.  Regulatory History of the BCH

In 1988, the Service listed the Bee Creek Cave Harvestman as endangered under 16 U.S.C. § 1533.  *See* U.S. Fish and Wildlife Service; Endangered and Threatened Wildlife and Plants; Final Rule To Determine Five Texas Cave Invertebrates To Be Endangered Species, 53 Fed. Reg. 36,029 (Sept. 16, 1988).  In 1993, the Service issued a correction, splitting the species into the Bee Creek Cave Harvestman and the Bone Cave Harvestman. *See* U.S. Fish and Wildlife Service; Endangered and Threatened Wildlife and Plants; Coffin Cave Mold Beetle (Batrisodes texanus) and the Bone Cave Harvestman (Texella reyesi) Determined to Be Endangered, 58 Fed. Reg. 43,818 (Aug. 18, 1993).  However, the initial findings for the Bee Creek Cave Harvestman also apply to the BCH.  *Id.* at 43,819. Since 1993 there have been multiple petitions to delist the BCH.  None have been successful.

---

[3]     "[E]xecutory laws that regulate subjects within Congress's enumerated powers but that significantly impair the autonomy of state governments can be 'improper' because such laws contravene constitutionally 'proper' principles of federalism." *See* Gary Lawson & Patricia B. Granger, *The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause*, 43 DUKE L.J. 267 (1993).

The BCH is a small eyeless arachnid (between 1.4 to 4 mm) that lives solely in caves and voids north of the Colorado River in Travis and Williamson counties, Texas.  *See* 53 Fed. Reg. 36,029-30; *GDF Realty I*, 326 F.3d at 625.  The species has "little or no ability to move appreciable distances on the surface." 53 Fed. Reg. 36,032.  Because the BCH is limited to isolated caves, BCH takes do not have a substantial effect on the ecosystem as a whole.  *See* 53 Fed. Reg. 36,030 ("This fragmentation of habitat has resulted in the isolation of groups of caves that have developed their own, highly localized faunas.").

There is no commercial market for the BCH.  *See GDF Realty I*, 326 F.3d at 638 ("Cave Species takes are neither economic nor commercial. There is no market for them; any future market is conjecture.").  The BCH has never been not bought or traded, nor does the species generate tourism.  *Id*. at 638 ("[T]here is no historic trade in the Cave Species, nor do tourists come to Texas to view them.").   Indeed, the Service has consistently held that commercial overutilization is not a threat to the BCH.  *See* 53 Fed. Reg. 36,031.

The Service justifies regulation of BCH takes on the grounds that the BCH is easily affected by human activities in and around its habitat.  *See* 53 Fed. Reg. 36,031.  For example, the Service points to obvious threats such as human presence in the caves, vandalism, blocking of cave entrances, and construction or other activities near the caves that could lead to cave-ins.  *Id*. at 36,032.  The Service also points to less obvious threats, such as activities or development on the land around BCH habitat that could lead to altered drainage patterns into the habitat or cause runoff to enter the habitat carrying chemicals and pesticides.  *Id.* at 36,031.   Indeed, the Service claims that even affecting

the level of humidity in BCH habitat could have harmful effects on the species.  *Id*. at 36,032.

Under existing regulations, development within 345 feet of a known BCH cave requires a payment of $10,000 an acre.  Ex. A, Declaration of Lisa Birkman ¶ 21.  This buffer begins at the outermost edge of the cave as it exists underground—not at the cave's entrance.  *Id*.  Development within 35 feet of a BCH cave requires a payment of $400,000.  *Id*.

On June 2, 2014, Plaintiffs filed a petition to delist the BCH based on scientific research regarding whether the species remains threatened.  *See* 80 Fed. Reg. 30,990. On June 1, 2015, a full year after Plaintiffs submitted a Delisting Petition, the Service announced a negative finding, refusing, once again, to remove the BCH from the Endangered Species List.  *Id*. at 30,996.

### B.  Injuries Sustained by Intervenors Due to the Continued Listing of the BCH

#### a.  John Yearwood

John Yearwood owns approximately 865 acres of ranch-land in Williamson County, Texas.  Ex. B, Declaration of John Yearwood ¶ 2.  The land has been in his family since 1871.  *Id*. at ¶ 3.  He lives on the property with his wife and son, who recently returned from serving in Afghanistan.  *Id*. at ¶ 5.  Mr. Yearwood has three BCH occupied sites on his property. *Id*. at ¶ 7.  Because the ESA prohibits Mr. Yearwood from engaging in any activities that could potentially harm any endangered species, the BCH listing significantly affects the ways in which Mr. Yearwood can use and enjoy his property in and around those BCH sites.  *Id*. at ¶ 16.

Prior to the discovery of BCH on his property, Mr. Yearwood made the areas around the caves available to the local 4-H club, church groups, and members of the military for camping, horseback riding, and other recreation.  *Id.* at ¶ 8. He also built a shooting range on the property for the local 4-H club to practice gun-sports.  *Id.* at ¶ 10. Mr. Yearwood does not charge these groups for the use of his property.  *Id.* at ¶ 9.  But for the federal regulations on BCH takes, Mr. Yearwood would continue to make the property available for recreation.  *Id.* at ¶ 11.

Unfortunately, Mr. Yearwood is less likely to use or allow others to use the land around the BCH caves due to the risk of prosecution for accidentally violating the ESA provisions prohibiting disturbing or harming BCH.  *Id.* at ¶ 12.  He is also less likely to develop or maintain the land around the BCH caves due to the risk of prosecution for accidentally violating the ESA provisions that prohibit harm to or disturbance of BCH. *Id.* at ¶ 15.

Mr. Yearwood is informed and believes that using his property around the BCH caves for hunting, camping, gun sports, horseback riding, or other recreation or even clearing brush to reduce the risk of snakes and fires around BCH habitat is likely to cause a BCH take.  *Id.* at ¶¶ 13-14.  Risk of prosecution for BCH takes therefore limits his ability to use and maintain his property as he sees fit.  *Id.* at ¶ 16.

### b.  Williamson County, Texas

Williamson County is located in Central Texas.  Ex. A, Declaration of Lisa Birkman ¶ 3.  There are approximately one hundred caves containing BCH in Williamson County.  *Id.* at ¶ 4.  Under Williamson County's Regional Habitat Conservation Plan ("Plan") and the County's 10(a) incidental take permit as approved by the Service, the

County must acquire and maintain at least three perpetual BCH preserves (karst fauna areas ("KFA")) in each of three designated karst fauna regions ("KFR") for a total of nine preserves. *Id.* at ¶ 5.

In the North Williamson KFR, the County holds these Service-recognized KFAs: Pricilla's Well, Cobb Cavern, Twin Springs, Karankawa. *Id.* at ¶ 6. The County is in process of acquiring Shaman KFA in addition to other preserve areas under the Williamson County's Plan umbrella. *Id.* at ¶ 6. In the central KFR, the County has two KFAs under Service and peer review: Millennium and Wilco KFAs. *Id.* at ¶ 6. In the south KFR, the county maintains two substantial permanent preserves, Beck and Chaos Cave, which have not been addressed as KFAs yet, and other minor preserves, including Beck Commons and Big Oak Preserve. *Id.* at ¶ 6. Privately controlled preserves include perpetual habitat areas inside Sun City providing over 100 acres of additional permanent preserves. *Id.* at ¶ 6.

The County also holds and manages eleven BCH habitat preserves totaling over 800 acres. *Id.* at ¶ 7. The County is in the process of acquiring an additional 70 acres of BCH preserve, bringing the total County-owned preserve land owned by the County to more than 900 acres. *Id.* at ¶ 8. The County estimates that it will have to acquire an additional 400 acres of BCH preserve to comply with the Plan. *Id.* at ¶ 9.

Maintenance of these preserves is expensive, time consuming, and results in the diversion of funds that would otherwise be expended to provide for the health, safety, and welfare services provided by the County to its residents. *Id.* at ¶ 10. The County must install and maintain metal grate coverings and take other actions to protect cave

entrances. *Id.* at ¶ 11.  County personnel are required to monitor the caves for fire ants and other hazards to the BCH.  *Id.* at ¶ 12.

If fire ants are present in or around a BCH cave, County personnel must eliminate the ants. *Id.* at ¶ 13. The County currently uses steam to eliminate the ants, because pesticides could prove deadly to BCH. *Id.* at ¶ 14.  The County's BCH fire ant service costs approximately $19,000 annually.  *Id.* at ¶ 15.

Additionally, the Plan requires the County to maintain a perpetual $20,000,000 conservation fund to cover any BCH conservation efforts including maintenance, monitoring and protection in perpetuity of established KFAs and preserve areas.  *Id.* at ¶ 16.  The conservation fund is funded, in part, by tax dollars that would otherwise flow into the County's general fund to be used by the County to provide services to residents. *Id.* at ¶ 17.

County buildings and facilities, parks, infrastructure and other County services have been adversely affected by the prohibition on BCH takes and the required incidental take permit.  *Id.* at ¶ 18.  The County anticipates the placement and cost of county buildings, facilities, parks, sports fields, water lines, and other County services will be impacted by the continued listing of the BCH .  *Id.* at ¶ 19.

IV.     **JURISDICTION AND STANDARD OF REVIEW**

In order to prevail on its APA claim, Intervenor-Plaintiffs must establish that the Service's continued assertion of authority over BCH takes or its failure to delist the species is not in accordance with law, 5 U.S.C. § 706(2)(A), or contrary to any constitutional right, power, privilege, or immunity, 5 U.S.C. § 706(2)(B).  Alternatively, Intervenor-Plaintiffs can show that the Service's continued assertion of authority over

BCH takes and or its failure to delist the species violates the Tenth Amendment to the U.S. Constitution. U.S. Const. amend. X.  To establish entitlement to judgment on either of these grounds, Intervenor-Plaintiffs must show that the Service's regulation of the BCH exceeds Congress's authority under the Commerce Clause as viewed through the Necessary and Proper Clause.

## V.   THE LEGAL FRAMEWORK HAS CHANGED SINCE *GDF REALTY I* WAS DECIDED.

This is not the first time that application of the ESA's take provision to the BCH has been at the center of a Commerce Clause challenge.  The Fifth Circuit considered this very issue thirteen years ago in *GDF Realty I*, concluding that application of the ESA's take provision to the BCH is a constitutional exercise of the Commerce Clause power. *See GDF Realty I*, 326 F.3d at 640–41.

*GDF Realty I* is controlling on most issues in this case.  But three subsequent decisions by the Supreme Court and Fifth Circuit, holding that the third "*Lopez* category" should be subject to review under the Necessary and Proper Clause, renders the conclusion of the *GDF Realty I* panel invalid.

The Commerce Clause authorizes Congress to regulate three distinct types of activities. *See Lopez*, 514 U.S. at 558–59.  These are commonly referred to as the *Lopez* categories. In *GDF Realty I*, the Fifth Circuit determined that neither of the first two *Lopez* categories were at issue, i.e., regulation of the BCH did not involve (1) "the use of the channels of interstate commerce"; or (2) "the instrumentalities of interstate commerce."  *GDF Realty I*, 326 F.3d at 628.[4]  Instead, the Fifth Circuit focused its

---

[4]      This portion of the court's analysis is not surprising. After all, a tiny cave dwelling arachnid is neither akin to a river (an channel of interstate commerce) nor a boat (an instrumentality of interstate commerce).

analysis on the third *Lopez* category and evaluated whether regulation of BCH takes under the ESA was the type of activity "that substantially affects interstate commerce." *Id.*  In evaluating the third *Lopez* category, the Court applied rational basis scrutiny.  *Id.* at 627 ("In reviewing an act of Congress passed under its Commerce Clause authority, we apply the rational basis test as interpreted by the *Lopez* court.").

Since the Fifth Circuit decision in *GDF Realty I* in 2003, two Supreme Court opinions, *Raich* and *Sebelius*, have changed the constitutional basis to evaluate the Commerce Clause under third *Lopez* category, from a pure Commerce Clause to analysis where the Commerce Clause must be viewed through the Necessary and Proper Clause.

In *Raich*, the Supreme Court first held that the third *Lopez* Category—under which *GDF Realty I* was decided—is not properly interpreted under the Commerce Clause, but instead falls under the Necessary and Proper Clause.[5]  The Fifth Circuit adopted this approach four years later in *Whaley*, 577 F.3d. at 260, and the Supreme Court affirmed this approach in *Sebelius*, 132 S.Ct at 2593 (characterizing *Raich* as a Necessary and Proper Clause decision and finding, "Accordingly, we recognized that Congress was acting well within its authority under the Necessary and Proper Clause . . . ") (internal quotation marks omitted).

This distinction is important because the Necessary and Proper Clause imposes a more rigorous standard of review than the rational basis scrutiny previously applied to ordinary Commerce Clause claims.  *See, e.g.*, *Sabri v. United States*, 541 U.S. 600, 612-13 (2004) (Thomas, J., concurring) ("'Appropriate' and 'plainly adapted' are hardly synonymous with 'means-end rationality . . . . [a] statute can have a 'rational' connection

---

[5]       *See Raich*, 545 U.S. at 34 (Scalia, J., concurring) (opining that "Congress's regulatory authority over intrastate activities that are not themselves part of interstate commerce (including activities that have a substantial effect on interstate commerce) derives from the Necessary and Proper Clause.").

to an enumerated power without being obviously or clearly tied to that enumerated power.  To show that a statute is  'plainly adapted' to a legitimate end, then, one must seemingly show more than that a particular statute is a 'rational means,' to safeguard that end; rather, it would seem necessary to show some obvious, simple, and direct relation between the statute and the enumerated power.") (internal citation omitted).  Given the new standard, *GDF Realty I*'s holding was rejected by the only district court to revisit this issue post *Raich, Sebelius,* and *Whaley*.  *See PETPO*, 57 F. Supp. 3d at 1346 (holding that the ESA's prohibition on takes of a purely intrastate species of prairie dog could not be justified under the Commerce Clause or the Necessary and Proper Clause).[6]

Given the benefit of these later cases, and applying the newly articulated standard, the Fifth Circuit panel's decision in *GDF Realty I* is no longer dispositive as to the ultimate issue.

## A.  Background of *GDF Realty I*

In *Morrison*, the Supreme Court articulated four factors to consider in determining whether a regulated activity "substantially affects" interstate commerce such to justify sustaining that activity under the Commerce Clause.  *Morrison*, 529 U.S. at 610-612. The Fifth Circuit in *GDF Realty I* considered these factors in its previous analysis of the constitutionality of the BCH, (1) the economic nature of the intrastate activity; (2) the presence of a jurisdictional element in the statute, which limits its application to matters affecting interstate commerce; (3) any congressional findings in the statute or its legislative history concerning the effect the regulated activity has on interstate commerce;

---

[6] *PETPO* is currently under review by the U.S. Court of Appeals for the Tenth Circuit.  *See* Tenth Circuit Court of Appeals Dkt. 14-4151 and 14-4165.

and (4) the attenuation of the link between the intrastate activity and its effect on interstate commerce. *See GDF Realty I*, 326 F.3d at 628-29.

The Fifth Circuit made several findings under the *Morrison* factors that would lead to the conclusion regulation of BCH takes would not be appropriate. First, the court concluded that BCH takes are non-economic. *See GDF Realty I*, 326 F.3d at 638 ("Cave Species takes are neither economic nor commercial. There is no market for them; any future market is conjecture. If the speculative future medicinal benefits from the Cave Species makes their regulation commercial, then almost anything would be."). Second, the panel held that "ESA's take provision has no jurisdictional requirement that might otherwise limit its application to species bearing some relationship to interstate commerce." *Id.* at 632–33. Finally, the court noted that the connection between BCH takes and interstate commerce, alone, was attenuated. *Id.* at 637-38 ("The possibility of future substantial effects of the Cave Species on interstate commerce, through industries such as medicine, is simply too hypothetical and attenuated from the regulation in question to pass constitutional muster."). The court explained, Cave Species takes cannot be aggregated with takes of other endangered species in order to convert the take of BCH to a commercial activity. *Id.* at 638 ("To accept such a justification would render meaningless any 'economic nature' prerequisite to aggregation."). A non-economic activity cannot be aggregated "based solely on the fact that, post-aggregation, the sum of the activities will have a substantial effect on commerce." *Id.* As the Supreme Court noted in *Morrison*, "our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." *Morrison*, 529 U.S. at 613.

In a surprise turn, though, the Fifth Circuit upheld the ESA's application to the BCH because (1) prohibition of BCH takes is part of the larger regulation of all endangered species takes, which is "directed at activity that is economic in nature," and (2) the regulation of BCH takes an "essential part of the economic regulatory scheme" because the "interdependence of species." *GDF Realty I*, 326 F.3d at 640. Put another way, the Fifth Circuit concluded that regulating BCH takes substantially affects interstate commerce because it is a regulation of intrastate non-economic activity that is a necessary part of a more general regulation of interstate commerce.

As explained below, that is precisely the category of activities that are now subject to heightened scrutiny under the Necessary and Proper Clause.

### B. The Supreme Court Decided Post-*GDF Realty I* that the Third *Lopez* Category Should Be Interpreted Under the Necessary and Proper Clause

Since *GDF Realty I* was decided, two Supreme Court opinions have changed the constitutional basis to evaluate the Commerce Clause under third *Lopez* category. In *Raich*, the Supreme Court held that the third *Lopez* Category—under which *GDF Realty I* was decided—is not properly interpreted under the Commerce Clause, but instead falls under the Necessary and Proper Clause.[7] The Fifth Circuit subsequently adopted this analysis in *Whaley*, 577 F.3d. at 260.

In *Sebelius*, 132 S.Ct. 2566 (2012) the Court examined more fully what that heightened scrutiny would look like. In that case the Court examined Congress's authority to force people to buy health insurance as part of the larger Affordable Care Act. *Id.* at 2571. Although the Court ultimately upheld the scheme as a tax, it found that the regulation could not be justified under the Commerce Clause when viewed through

---

[7]     *See Raich*, 545 U.S. at 34 (Scalia, J., concurring).

the Necessary and Proper Clause.  *Id.* at 2592. Drawing on a line of cases dating back to *M'Culloch v. Maryland*, 17 U.S. 316, 421, 4 L. Ed. 579 (1819), the court noted that to survive review under the Necessary and Proper Clause a regulation must be "plainly adapted" to serve an enumerated power and "consistent with the letter and spirit of the Constitution." *Sebelius*, 132 S. Ct. at 2579.  To meet that standard a regulation must be (1) "narrow in scope," (2) "incidental" to the regulation of commerce, and (3) cannot "work a substantial expansion of federal authority." *Sebelius*, 132 S. Ct. at 2592.

It was this third prong that the Court found the most important. Looking to the individual mandate the Court assumed, for the sake of argument, that the ACA was a general economic regulation and assumed that the mandate was "necessary" to the ACA. Nonetheless, the Court held that the mandate was not justified by the Necessary and Proper Clause because it expanded federal authority in a way that was not "proper." *Id.* at 2592 ("Even if the individual mandate is 'necessary' to the Act's insurance reforms, such an expansion of federal power is not a 'proper' means for making those reforms effective."). The Court noted that while the scope of the Commerce Clause and Necessary and Proper Clause is "uncertain," "[t]he proposition that the Federal Government cannot do everything is a fundamental precept." *Id.* at 2647.  This statement directly contradicts *GDF Realty I*'s holding that anything that affects the ecosystem is commerce and therefore subject to federal regulation.  *See GDF Realty I*, 326 F.3d at 640.

The Fifth Circuit did not have the benefit of the Supreme Court's decisions in *Raich* and *Sebelius* when it decided *GDF Realty I*; therefore, it did not undertake an analysis under the Necessary and Proper Clause in deciding the BCH case in 2003.  Notably, the

only case to review the question since those cases were decided refused to follow *GDF Realty I*. In *PETPO*, 57 F. Supp 3d at 1346, the court considered the ESA listing of the Utah prairie dog—an intrastate animal that only exists in Utah and does not impact interstate commerce. *See id.* The court concluded that, while the ESA regulates "some economic activity," the take rule as applied to a wholly intrastate, noneconomic species was not essential or necessary to the ESA's economic scheme. *Id.* at 1345-46. Neither the Commerce Clause, nor the Necessary and Proper Clause "authorize Congress to regulate takes of a purely intrastate species that has no substantial effect on interstate commerce." *PETPO*, 57 F. Supp. 3d at 1346.

## VI.   REGULATION OF BCH IS NOT PERMITTED UNDER THE NECESSARY AND PROPER CLAUSE

The Necessary and Proper Clause requires that regulations be (1) "narrow in scope," (2) "incidental" to the regulation of commerce, and (3) cannot "work a substantial expansion of federal authority." *Sebelius*, 132 S. Ct. at 2592. The application of the ESA to a purely intrastate species that is not bought, sold, or traded in interstate commerce cannot survive review under this standard.

First, the broad regulation of BCH takes is not narrow in scope. The regulation is a blanket prohibition on activities that include harassing, harming, pursuing, hunting, shooting, wounding, killing, trapping, capturing, or collecting, or attempting to engage in any such conduct. *See* 16 U.S.C. § 1532(19). Second, the regulation of BCH takes is not incidental to the regulation of interstate commerce. The ESA is designed to prevent species loss. *See* 16 U.S.C. § 1531. There are no legislative findings addressing the effect of takes of this wholly intrastate, noncommercial species on interstate commerce. *See* 16 U.S.C. §§ 1531-1544; 50 C.F.R. § 17.40(g). The ESA take provisions may have

19

an incidental effect on commerce, but that gets the relationship precisely backwards.  A regulation is proper if it is incidental to a broader regulation of commerce, not if it is part of a broader regulation of non-commercial activity that happens to affect commerce.  *See GDF Realty II*, 362 F.3d at 291 ("It is undeniable that many ESA-prohibited takings of endangered species may be regulated, and even aggregated, under *Lopez* and *Morrison* because they involve commercial or commercially-related activities like hunting, tourism and scientific research . . . . [b]ut in this case, there is no link—as the panel concedes— between Cave Species takes and *any* sort of commerce . . .") (emphasis in original). Finally, as explained below, the prohibition on BCH takes expands federal authority in a manner that is neither essential nor proper to any valid exercise of the commerce authority.

### A. Regulation of the Take of the BCH Is Not an Essential Part of the ESA

Congress's regulatory authority over intrastate activities that are not themselves part of interstate commerce (including activities that have a substantial effect on interstate commerce) derives from the Necessary and Proper Clause.  *See Raich*, 545 U.S. at 34 (Scalia, J., concurring); *see also Sebelius*, 132 S. Ct. at 2593 (2012) (characterizing *Raich* as a Necessary and Proper Clause decision—"Accordingly, we recognized that Congress was acting well within its authority under the Necessary and Proper Clause . . . .") (internal quotation marks omitted).

The Supreme Court decided in *Raich* that the federal government may only regulate intrastate, noncommercial activity when the activity is an "essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated."  *Raich* at 24.  This approach has only been

applied to the actual regulation of economic activities—not pseudo-economic activities as is seen with the ESA.  Here, the Court is considering the BCH, which is not a commodity at all, much less a "fungible commodit[y]."  *Id.* at 40.

The legislative history of the ESA includes no findings with respect to how the take of a wholly intrastate, noneconomic species such as the BCH impacts interstate commerce.  The ESA's take provisions were passed by Congress to protect biodiversity, the interdependence of species, and the value of endangered species' genetic heritage.  *See* H.R. Rep. No. 93-412, at 4 (1973).  There is no indication that Congress passed the ESA take provisions with the intent of regulating "economic activities" or that the ESA involves "the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market."  *Raich*, 545 U.S. at 3.  Therefore, the Necessary and Proper Clause and the Supreme Court's reasoning in *Raich* do not justify regulation of the BCH in the first instance because the ESA is not part of a "larger regulation of economic activity."

To the extent the court considers the take provisions of the ESA as a regulation of economic activity, the regulation of the take of the BCH as a wholly intrastate species is not an essential or "necessary" part of the overall ESA take regulatory scheme.  The BCH are located in just two counties in Texas.  *See GDF Realty I*, 326 F.3d at 624 (noting that the case involved six species "found only within two counties in Texas.").  There is no commercial market for the BCH, they are not a keystone species an ecosystem depends upon, and no species of commercial value depends upon them for their existence.  *See id.* at 640 (noting that the essential purpose of the ESA is to protect ecosystems upon which species depend).  The BCH are as clear a case as there can be of a noneconomic,

intrastate species.  In *Raich*, failure to uphold the regulation of the intrastate market of marijuana would have frustrated or "undercut" the primary purpose for the CSA in prohibiting marijuana from the interstate market.  *See Raich*, 545 U.S. at 38.  In the case of the BCH, the inability to regulate BCH takes would not frustrate the Service's ability to regulate takes of commercially valuable species, species within the channels of commerce, or intrastate species on federal land under the ESA.  Indeed, takes of the BCH have no effect on any other species, commercial or otherwise.  Thus, the regulation of BCH and of BCH takes is unnecessary to vindicate any comprehensive economic regulatory scheme.  *See PETPO*, 57 F. Supp. 3d at 1346 (declining to justify the regulation of the take of a wholly intrastate, noneconomic species under the Necessary and Proper Clause where the take of such species "on non-federal land—even to the point of extinction—would not substantially affect the national market for any commodity regulated by the ESA").  We do not ask the Court to overturn the ESA's take provisions in their entirety, just simply the application to the wholly intrastate, noneconomic BCH.

A decision by this court that the ESA take provision as applied to the BCH is beyond Congress's constitutionally enumerated powers will not undercut the ESA.  It will have no effect on species that are properly regulated under the ESA.  The federal government can avoid constitutionally impermissible regulation such as this simply by demonstrating that the intrastate takes of a species is either economic and has a substantial effect on interstate commerce or is noneconomic but regulation is necessary to effectuate the ESA under *Raich*.  Regulating the take of the BCH does not qualify as either.

### B. Regulation of the Take of BCH, a Noneconomic, Intrastate Species, Is Not A Proper Means for Executing the ESA Because it Substantially Expands Federal Authority

To the extent the court disagrees and concludes that regulation of intrastate, noneconomic species such as the BCH is essential or "necessary" to the ESA as a comprehensive economic regulatory scheme, such a broad expansion of federal power should not be upheld as it violates the Necessary and Proper Clause as a regulation not "proper," as it infringes on states' rights.  *See Sebelius* 132 S. Ct. at 2592.[8]  In *Sebelius*, Justice Roberts reiterated a higher standard, noting that even a "necessary" regulation could still not be "proper" if it "would work a substantial expansion of federal authority." *Id.*  Congress may not reach "beyond the natural limit of its authority and draw within its regulatory scope those who otherwise would be outside of it."  *Id.*  "[I]t is hardly 'necessary' to regulate every form of local activity in order to regulate the three heads of commerce over which Congress has power.  And it is surely not 'proper' to do so."  *See* Richard A. Epstein, *The Proper Scope of the Commerce Power*, 73 Va. L. Rev. 1387 (1987).  To survive review under the Necessary and Proper Clause, the authority granted must be "narrow in scope" and "incidental to the exercise of the commerce power." *Sebelius*, 132 S.Ct. at 2592.

There is no question in this forum as to the federal government's ability to regulate the take of commercially valuable species, species within the channels of commerce, or intrastate species on federal land under the ESA.  However, extending the

---

[8]  *See also Whaley*, 577 F.3d at 260 ("As Justice Scalia has explained in the context of the third *Lopez* category, the Necessary and Proper Clause gives Congress the power to 'regulate even noneconomic local activity if that regulation is a necessary part of a more general regulation of interstate commerce.  The relevant question is simply whether the means chosen are 'reasonably adapted' to the attainment of a legitimate end under the commerce power.'").

federal government's authority to regulate a species such as the BCH, which is located entirely intrastate and has no economic value or meaningful connection to the wide ecosystem is beyond the limits of the constitution.

The Supreme Court recognized in *Lopez* that determining the outer limits of the federal government's authority under the Commerce Clause requires evaluating whether or not an activity is economic. *See generally Lopez*, 514 U.S. at 561. Migrating away from this view is a slippery slope because, as the Supreme Court recognized in *Lopez*, "depending on the level of generality, any activity can be looked upon as commercial." *Id.* at 565.

Here, it is clear that regulation of the BCH is not an economic regulation; therefore, allowing regulation of the take of the BCH would vastly increase the power of the federal government. Extending the ESA's regulation of take to the BCH would blur the line between "what is truly national and what is truly local" regulation and impermissibly convert Congress's authority under the Commerce Clause to a "general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567. The government may not "pile inference upon inference in a manner that would bid fair to convert congressional Commerce Clause authority to a general police power of the sort held only by the States." *Id.*

VII.   CONCLUSION

For the foregoing reasons, the listing of the BCH under the ESA and prohibition on its take exceeds Congress's authority under the Commerce Clause. Furthermore, should the court conclude that regulation of the take of the BCH has a substantial effect on interstate commerce, we believe that application of the ESA take provisions to the

24

BCH as a wholly intrastate, noneconomic species results in a limitless expansion of federal authority, which is impermissible under the Necessary and Proper Clause.

Dated: November 15, 2016                   RESPECTFULLY SUBMITTED,


                                           /s/ Robert Henneke
                                           ROBERT HENNEKE
                                           Texas Bar No. 24046058
                                           rhenneke@texaspolicy.com
                                           CHANCE WELDON
                                           Texas Bar No. 24076767
                                           cweldon@texaspolicy.com
                                           Texas Public Policy Foundation
                                           Center for the American Future
                                           901 Congress Avenue
                                           Austin, TX 78701
                                           Phone: 512-472-2700


                                           CHAD ENNIS
                                           Texas Bar No. 240045834
                                           chad.ennis@bracewelllaw.com
                                           KEVIN COLLINS
                                           Texas Bar No. 24050438
                                           kevin.collins@bracewelllaw.com
                                           BRACEWELL LLP
                                           111 Congress Ave., Suite 2300
                                           Austin, TX 78701
                                           PHONE : 512-473-7800

                                           *Attorneys for Intervenors-Plaintiffs John*
                                           *Yearwood and Williamson County, Texas*



                        **CERTIFICATE OF SERVICE**

        The undersigned hereby certifies that on November 15, 2016 a true and correct
copy of the foregoing was served via electronic means to all parties entitled to receive
notice in this case through the Court's ECF system.‥


                              /s/ Chad Ennis
                              Chad Ennis