# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| AMERICAN STEWARDS OF LIBERTY, ET AL., | § § § | |
| *PLAINTIFFS*, | § § | |
| AND | § § | |
| JOHN YEARWOOD; AND WILLIAMSON COUNTY, TEXAS | § § § § | |
| *INTERVENOR-PLAINTIFFS* | § § § | |
| V. | § § | CIVIL ACTION NO. 15-CV-1174-LY |
| UNITED STATES FISH & WILDLIFE SERVICE, ET AL., | § § § § | |
| *DEFENDANTS*. | § § | |

**BRIEF OF TEXAS AS *AMICUS CURIAE* IN SUPPORT OF INTERVENOR-PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## INTEREST OF *AMICUS CURIAE*

Texas appears as *amicus curiae* to preserve the constitutional limits that prevent the federal government from regulating purely intrastate, noneconomic activity. Texas is impacted by Defendants' interference in a local matter that is "clearly without [the federal government's] powers." Alexander Hamilton, OPINION ON THE CONSTITUTIONALITY OF A NATIONAL BANK (Feb. 23, 1791), *reprinted in* HAMILTON: WRITINGS 621 (Joanne B. Freeman ed., 2001). Texas files this *amicus* brief to contest a clear overreach in the use of federal power, because every citizen suffers harm when the federal government acts outside its constitutional authority.

This short brief seeks to assist the Court by addressing the current jurisprudence on the Necessary and Proper Clause, which supplies an important substantive check on federal power. Here, the Supreme Court's recent holdings prevent the overreach by Defendants, who intend to regulate the Bone Cave Harvestman ("BCH") despite the fact that the species has no commercial value or presence outside of Texas.

## ARGUMENT

The Supreme Court recently issued two important opinions—*Gonzales v. Raich*, 545 U.S. 1 (2005), and *National Federation of Independent Businesses v. Sebelius*, 132 S. Ct. 2566 (2012)—on the scope of the Necessary and Proper Clause (the "Clause"). Both opinions rely heavily on the views of Framers and the nearly two-centuries-old opinion in *McCulloch v. Maryland*, 17 U.S. 316 (1819). *Raich* and *Sebelius* also depart materially from the Fifth Circuit's reasoning in *GDF Realty Investments, Ltd. v. Norton* (*GDF Realty*), 326 F.3d 622 (5th Cir. 2003), an earlier-decided case that addressed the very issue disputed here—whether regulation of the BCH is a legitimate exercise of federal power.

Texas's argument proceeds in three parts. Because the Framers' vision, as well as *McCulloch*, shapes *Raich* and *Sebelius* in crucial respects, the first part addresses the early—through now very relevant—perspective on the scope of the Clause. The

second part discusses the Fifth Circuit's now outdated decision in *GDF Realty* in light of *Raich* and *Sebelius*. And in the third section, Texas argues that the BCH rules at issue cannot survive the rigorous standard set forth in *Raich* and *Sebelius*.

I.   **The Necessary and Proper Clause Limits Congressional Power.**

Apart from granting Congress specific powers, the Constitution provides the federal legislature the authority "[t]o make all Law which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department of Officer thereof." U.S. CONST. art. 1, § 8, cl. 18.

As the authors of the *Federalist Papers* explained, the Clause expresses what is already implicit, namely that the Constitution vests Congress with the means, or implied powers, necessary to carry out its enumerated powers. Thus, even if the Constitution lacked the Clause, "there can be no doubt that all the particular powers, requisite as means of executing the general powers, would have resulted to the government, by unavoidable implication." THE FEDERALIST No. 44, at 234–35 (James Madison) (Carey & McClellan eds., 2001); *see also id.* No. 33 at 158 (Alexander Hamilton) ("[The Supremacy and Necessary and Proper Clauses] are only declaratory of a truth, which would have resulted by necessary and unavoidable implication from the very act of constituting a federal government, and vesting it with certain specified powers.").

Moreover, quite the opposite from granting Congress *carte blanche* to select any measure to implement a program, the Clause circumscribes federal power. In specifying that Congress's implied powers extend only to those means that are "necessary and proper" to the execution of an enumerated power, it amounts to "a powerful and immediate check on the proceedings of the federal legislature." St. George Tucker, VIEW OF THE CONSTITUTION OF THE UNITED STATES WITH SELECTED WRITINGS 228 (1803). "[F]orced constructions" and the "pretence" of federal authority do not

pass muster under the Clause. THE FEDERALIST No. 33, at 160 (Alexander Hamilton). And where Congress "shall misconstrue this part of the Constitution, and exercise powers not warranted by its true meaning," a judicial finding of unconstitutionality is warranted. *Id*. No. 44, at 235 (James Madison).

Even though they disagreed on whether particular exercises of federal power under the Clause were constitutional, members of the Founding generation agreed on the proper standard—implied powers must be plainly connected to legitimate federal ends. Early debates over the propriety of a national bank illustrate this congruence of thought.

### A. Political Opponents Agreed that the Clause Requires a Rigorous Standard.

James Madison construed the Clause as requiring "direct and incidental means," and regarded the constitutional rationale for the national bank as attenuated and speculative. James Madison, SPEECH IN CONGRESS OPPOSING THE NATIONAL BANK (Feb. 2, 1791), *reprinted in* MADISON: WRITINGS 485 (Jack N. Rakove, ed., 1999) (quoting disapprovingly from a bill asserting that the bank "might be conceived to be conducive to the successful conducting of the finances"). Similarly, while Alexander Hamilton defended the constitutionality of the bank, he did so by demonstrating the "natural & obvious relation between the institution of a bank, and the objects of several of the enumerated powers of the government." Hamilton, OPINION ON THE CONSTITUTIONALITY OF A NATIONAL BANK, at 632. And like Madison, Hamilton emphasized that, to be constitutional, the implied power must have a demonstrable connection to an enumerated power; a relationship that is attenuated, implausible, or merely a pretext does not suffice. "If the end be clearly comprehended within any of the specified powers, and if the measure have an *obvious relation* to that end, and is not forbidden by any particular provision of the constitution—it may safely be deemed to come within the compass of the national authority." *Id*. at 621 (emphasis added).

### B. *McCulloch* Adopts the Framers' Vision for the Clause.

The Supreme Court soon ratified the Framers' understanding of the constitutional scope of implied powers. In *McCulloch v. Maryland*, decided in 1819, Chief Justice Marshall construed the Clause as permitting measures that are "incidental to those powers which are expressly given" and "a direct mode of executing them." 17 U.S. 316, 411. (1819). Like the *Federalist* authors, *McCulloch* emphasizes that the Clause does not grant any "great substantive and independent power." *Id*. The Clause enables Congress "to perform the high duties assigned to it," and not to "transcend" the limited powers of the federal government. *Id*. at 421.

And consistent with the view of the Framers, *McCulloch* requires a connection between implied and enumerated powers that is "plain," not remote or attenuated. "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are *plainly adapted to that end*, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *Id*. (emphasis added).

### II. After *GDF Realty*, the Supreme Court Reasserted a Strict Standard in Construing the Clause.

For nearly a century, as the federal commerce power expanded, the implied powers doctrine largely lay dormant.[1] *See*, *e.g.*, Alex Kozinski, *Introduction to Volume 19,* 19 HARV. J.L. PUB. POL., 1, 5 (1995) (questioning "why anyone would make the mistake of calling it the Commerce Clause instead of the 'hey-you-can-do-whatever-you-feel-like clause'"). But after the Supreme Court restricted the use of the Commerce power in *United States v. Lopez*, 514 U.S. 549 (1995) (invalidating the Gun-

---

[1] After *McCulloch*, the Supreme Court continued to limit the scope of the Clause into the early twentieth-century, when the expansion of the commerce clause power reduced the salience of implied powers. *See*, *e.g.*, *Shreveport Rate Cases*, 234 U.S. 342 (1914) (holding that the clear connection between discriminatory intrastate shipping rates and interstate commerce justified the federal regulation of intrastate rates); *United States v. Coombs*, 37 U.S. 72, 78 (1838) (upholding a federal statute punishing the plunder of ships stranded on land because the prohibited activities "are all of a nature which tend essentially to obstruct, prevent, or destroy the due operations" of foreign and interstate commerce).

Free School Zones Act) and *United States v. Morrison*, 529 U.S. 598 (2000) (striking down damages portion of Violence Against Women Act), the Supreme Court shed new light on its implied powers jurisprudence in *Gonzalez* v. *Raich* and *National Federation of Independent Businesses v. Sebelius*.

Significantly, *Raich* and *Sebelius* came *after* the Fifth Circuit addressed the very question at issue here in *GDF Realty*. *GDF Realty* is, in substantial part, irreconcilable with *Raich* and *Sebelius*.

### A. *GDF Realty* Applied a Now Outdated "Effect-on-the-Ecosystem" Test.

*GDF Realty* upheld a federal rule prohibiting the "taking"[2] of the BCH, the same rule and the same tiny arachnid species at the center of this case. *GDF Realty* properly found that BCH takings did not have a substantial effect on interstate commerce. 326 F.3d at 637–38 (determining that effect of the loss of the species on the travel and publication industries was negligible, and that the possibility of the future substantial effects of the BCH on interstate commerce was "simply too hypothetical and attenuated"). Nevertheless, the Fifth Court affirmed the regulation because preventing BCH takings was an "essential part" of the statute authorizing the rule. *Id*. at 640.

### B. *Raich* Rejects "Remote Chains of Inference."

After *GDF Realty*, the Supreme Court revisited the Clause and articulated a more rigorous standard than the effect-on-the-ecosystem test. In *Raich*, the Court held that because marijuana is a fungible commodity that can be easily sold across state lines, the federal government may regulate intrastate cultivation and use of the

---

[2] To "take," under the Endangered Species Act, is to "harass, harm, pursue, hunt, shoot, wound, trap, capture, or collect" any member of a protected species. 16 U.S.C. § 1532(19). Defendant Fish and Wildlife Service defines "harm" to include significant modifications or degradations of a habitat which kill or injure protected wildlife "by significantly impairing essential behavior patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

controlled substance. 545 U.S. at 31–32. In a concurring opinion, Justice Scalia clarified that while the Commerce Clause permits congressional regulation of the channels and instrumentalities of interstate commerce, "Congress's regulatory authority over intrastate activities that are not themselves part of interstate commerce (including activities that have a substantial effect on interstate commerce) derives from the Necessary and Proper Clause." *Id.* at 34.

Justice Scalia construed the Clause according to its original and longstanding meaning. Scalia asserted that regulation of intrastate activities was permissible under the Clause in two circumstances: (1) the regulation substantially affects interstate commerce; or (2) the regulation is a necessary part of a more general regulation of interstate commerce. *Id.* at 35–36. Both circumstances, he maintained, require a clear and direct connection between the regulation of the intrastate activity and a valid regulation of interstate commerce. Echoing Hamilton and Madison, Scalia opined that the "substantially affects" test does not permit courts to "pile inference upon inference" or to string together a "remote chain of inferences" to establish that noneconomic activity has a substantial effect on interstate commerce. *Id.* at 36. And quoting Chief Justice Marshall, he indicated that, for a regulation of noneconomic activity to be deemed essential to a larger regulation, the former must be "appropriate" and "plainly adapted" to the latter. *Id.* at 39 (quoting *McCulloch*, 17 U.S. at 421).

### C. *Sebelius* Distinguishes Implied and Independent Powers.

Using the analytical framework articulated by the Framers, and reiterated by Justice Scalia in *Raich*, the Supreme Court then held that Congress lacks the power to compel individuals to purchase health care insurance under the Clause. *Sebelius*,132 S. Ct. at 2591–93.[3] Quoting Madison, the Court noted that the Clause is "'merely a declaration, for the removal of all uncertainty, that the means of carrying

---

[3] The Supreme Court upheld the commonly known "individual mandate" as a lawful exercise of Congress's taxing power, but not of its power to regulate interstate commerce. *Sebelius*, 132 S.Ct. at 2598.

into execution those [powers] otherwise granted are included in the grant.'" *Id.* at 2591. The Court defined implied powers as "derivative of, and in service to, a granted power," "narrow in scope," and "incidental" to an enumerated power. *Id.* at 2592. And consistent with the Framers' understanding, it rejected "a conception of the Necessary and Proper Clause [that] would work a substantial expansion of federal authority," *id.*, or would "license the exercise of any 'great substantive and independent power' beyond those specifically enumerated," *id.* at 2591 (quoting *McCulloch*, 316 U.S. at 411).

The individual mandate did not satisfy the rigorous test. Rather than being "in service to" or "incidental to" an enumerated power; it "vests Congress with the extraordinary ability to create the necessary predicate of an enumerated power." *Id.* at 2592. Far from being "narrow in scope," the individual mandate allows Congress to "reach beyond the natural limit of its authority and draw within its regulatory scope those who otherwise would be outside of it." *Id.* And unlike *Raich*, which concerned comprehensive regulations of the interstate market in a widely distributed (if illegal) commodity, the individual mandate required the sanctioning of a "great substantive and independent power," which was not incidental to or derivative of the interstate commerce power. *Id.* at 2592–93.

### III.  Defendants' Regulation Does Not Survive the Appropriate Standard.

Defendants seek to regulate an activity that allegedly harms the BCH, a tiny, cave-dwelling arachnid that resides in two Texas counties. *GDF Realty,* 326 F.3d at 625. The BCH has "little or no ability to move appreciable distances" outside of their dwelling places, much less to wander into any of the four states bordering Texas, or into Mexico. 53 Fed. Reg. 36,032 (Sept. 16, 1988). And the species has no economic value. They are not purchased or sold in local or interstate commerce, nor do they attract tourists from outside of Texas to see them. *GDF Realty*, 326 F.3d at 638.

Yet, since 1988, the BCH has been listed as an endangered species and, therefore, protected from takings under the ESA. 53 Fed. Reg. 36,029 (Sept. 16, 1988). Whether or not a desire to protect the BCH is sound policy is not at issue. Rather, this dispute centers on whether the Constitution affords *Defendants* the authority to regulate a species that is found only in Texas. Plainly, it does not.

The argument for federal regulation of the BCH proceeds under the Commerce Clause, which provides Congress—and, through legislative delegation, Defendants—the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST., art 1, § 8. In *Lopez*, the Supreme Court identified "three categories of activities that Congress may regulate under its commerce power:" (1) the channels of interstate commerce, (2) the instrumentalities of interstate commerce, and (3) activities having a substantial relation to interstate commerce. 514 U.S. at 558–59.

The regulation of the BCH lies under the third *Lopez* category, *GDF Realty*, 326 F.3d at 628, which derives from the Clause, *Raich*, 545 U.S. at 34; *Sebelius*, 132 S. Ct. at 2591–93; *United States v. Whaley*, 577 F.3d 254, 260–61 (5th Cir. 2009) (evaluating regulation of intrastate activity under the Clause). To satisfy the Clause, the regulated activity—anything impacting the BCH—must substantially affect interstate commerce,[4] or the rules protecting the species from takings must be an essential component of a more general regulation of interstate commerce. *Raich,* 545 U.S. at 35–36. As earlier noted, *GDF Realty* properly foreclosed the first avenue. *See* II.A, *supra.*

---

[4] The focus of the third *Lopez* category is on the economic effect of the "regulated activity," rather than the economic consequences of the regulation itself. *GDF Realty*, 326 F.3d at 636 ("Nowhere is it suggested that Congress can regulate activities not having a substantial effect of commerce *because the regulation itself can be crafted in such a fashion as to have such an effect.*" (quoting *Nat'l Ass'n of Home Builders v. Babbitt*, 130 F.3d 1041, 1067 (D.C. Cir. 1997) (emphasis in original))).

*Raich* and *Sebelius* now make it apparent that the BCH rules are not a constitutionally necessary means to a larger regulation of interstate commerce. The BCH is not "a fungible commodity for which there is an established . . . interstate market." *Raich*, 545 U.S. at 18. The species has no commercial value, has never been purchased or sold on any market, and never been known to reside outside of two counties in Texas. Thus, the rules protecting the species are not "appropriate," "plainly adapted," "incidental to," "derivative of," or "in service to" the commerce power. *Id*. at 39; *Sebelius*, 132 S. Ct. at 2592.

*GDF Realty* held that regulation of the BCH is "an essential part" of a larger regulatory scheme. 326 F.3d at 640. Central to this ruling was the Court's finding that harming the BCH would affect the "interdependent web" of all species. *Id*. This finding, however, is inconsistent with the original understanding of the Clause, and irreconcilable with *Raich* and *Sebelius*. In short, there is no "obvious relationship" between the means—protecting the BCH—and the ends—the protection of the ecosystem. *See* Hamilton, OPINION ON THE CONSTITUTIONALITY OF A NATIONAL BANK, at 621. Not a single species, much less the "ecosystem," is dependent on the BCH. 53 Fed. Reg. 36,030 (Sept. 16, 1988) (describing the "fragmentation of habitat" and "isolation" of the species). Far from being "plainly adapted" to a legitimate exercise of federal power, *see Raich*, 545 U.S. at 36 (quoting *McCulloch*, 17 U.S. at 421), Defendants' rules rely on a "remote chain" of causation, the very kind of attenuated rationalization that "piles inference upon inference." Accordingly, the rules fall short of the standard articulated in *Raich* and reaffirmed in *Sebelius*.

And even assuming (based on pure conjecture) that the BCH regulation affects "the ecosystem," the regulation is impermissible. Under the Clause, Congress may enact only measures necessary for the execution of its enumerated powers. To quote Chief Justices Marshall and Roberts, it does not furnish the "great substantive and independent power" to regulate the ecosystem. *Sebelius*, 132 S. Ct at 2591–92. "If

Congress could use the Commerce Clause to regulate anything that might affect the ecosystem (to say nothing about its effect of commerce), there would be no logical stopping point to congressional power under the Commerce Clause." *People for the Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv.*, 57 F. Supp. 3d 1337, 1344 (D. Utah 2014). Indeed, that would bring about precisely what Madison warned against in the event that, "[i]f instead of direct and incidental means, any means could be used" to execute federal power, to wit: "[t]he essential characteristic of the government, as composed of limited and enumerated powers, would be destroyed." Madison, SPEECH IN CONGRESS OPPOSING THE NATIONAL BANK, at 485. Fortunately, there is no basis for "such an expansion of federal power" under existing precedent. *Sebelius*, 132 S. Ct. at 2592.

## CONCLUSION

For the reasons stated herein, and in Intervenor-Plaintiff's Motion for Summary Judgment, *amicus* respectfully submits that the basis of the relief requested by Intervenor-Plaintiffs is well-founded, and that the relief they seek should be granted.

Respectfully submitted this the 13th day of December, 2016,

>KEN PAXTON
>Attorney General of Texas
>
>JEFFREY C. MATEER
>First Assistant Attorney General
>
>BRANTLEY D. STARR
>Deputy First Assistant Attorney General
>
>PRERAK SHAH
>Senior Counsel to the Attorney General
>
>ANDREW D. LEONIE
>Associate Deputy Attorney General
>
>AUSTIN R. NIMOCKS
>Associate Deputy Attorney General
>
>*/s/ Michael C. Toth*
>MICHAEL C. TOTH
>Senior Counsel
>Texas Bar No. 24100608
>michael.toth@oag.texas.gov
>
>JOEL STONEDALE
>Counsel
>
>Office of Special Litigation
>ATTORNEY GENERAL OF TEXAS
>P.O. Box 12548, Mail Code 009
>Austin, Texas 78711-2548
>Tel: 512-936-1414
>
>*Attorneys for Intervenor*

## CERTIFICATE OF SERVICE

I, Michael Toth, hereby certify that on this the 13th day of December, 2016, a true and correct copy of the foregoing document was transmitted via using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

>*/s/ Michael C. Toth*
>MICHAEL C. TOTH