

ATTORNEYS AT LAW

919 Congress Avenue
Suite 1050
Austin, TX 78701
T 512.651.0660
F 512.651.0670

Alan Glen
D 512.813.7943
aglen@nossaman.com

September 14, 2015

**VIA FEDERAL EXPRESS**

The Honorable Sally Jewell
Secretary of the Interior
U.S. Department of Interior
1849 C Street, NW
Washington, DC 20240

Dr. Benjamin N. Tuggle
Southwest Regional Director
U.S. Fish and Wildlife Service
500 Gold Avenue, SW
Albuquerque, NM 87102

The Honorable Daniel M. Ashe
Director
U.S. Fish and Wildlife Service
1849 C Street, NW
Washington, DC 20240

Re:   Notice of Intent to File Suit Concerning a Negative 90-day Finding on a Petition to Delist the Bone Cave Harvestman under the Endangered Species Act ("ESA")

Dear Secretary Jewell, Director Ashe, and Regional Director Tuggle:

Pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(2), this letter serves as a 60-day notice on behalf of the American Stewards of Liberty and other interested parties of intent to sue the U.S. Fish and Wildlife Service ("Service") in regards to its June 1, 2015, 90-day finding that the June 2014 petition to delist the Bone Cave harvestman, *Texella reyesi* ("BCH"), under the ESA did not present substantial scientific information indicating that delisting may be warranted. 80 Fed. Reg. 30990 (June 1, 2015) [hereinafter "Negative Finding"].

## BACKGROUND

### 1.   The ESA 90-Day Finding

The ESA requires the Secretary of the Interior, acting through the Service, to the maximum extent practicable, within 90 days after receiving a petition to delist a threatened or endangered species under the ESA, make a finding as to whether the petition presents substantial information indicating that delisting may be warranted. 50 C.F.R. § 424.14(b)(1). If the Secretary makes a positive 90-day finding by determining that a petition presents substantial

information indicating the petitioned action may be warranted, the Secretary is required to commence a review of the species' status and make a determination as to whether listing is warranted. This second determination is called a "12-month finding." If the Secretary makes a negative 90-day finding, the petition is rejected and no further review is conducted by the agency. A negative 90-day finding is then subject to judicial review. 16 U.S.C. §§ 1533(b)(3)(C)(ii), 1540(g).

Making a positive 90-day finding is a low bar, as it simply triggers further review of the status of a species. At the 90-day finding stage, the Secretary is required to determine only whether a petition presents substantial scientific information indicating the petitioned action may be warranted. Service regulations define "substantial information" as "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 16 U.S.C. § 1534(b)(3)(A); 50 C.F.R. § 424.14(b)(1). The Secretary does not critically analyze petitions, conduct additional research, or make a determination as to whether listing under the ESA is warranted at the 90-day finding stage. *See, e.g., Colorado River Cutthroat Trout v. Kempthorne*, 448 F.Supp.2d 170, 176–77 (D.D.C. 2006) (recognizing the Service's explicit acknowledgement, in the agency's routine statement in 90-day findings on petitions, that it does not conduct additional research or subject the petition to rigorous critical review at the 90-day finding stage). In a 90-day review, the Service may utilize the information that it already has in its files regarding the species in addition to the information provided in the petition; however, the Service may not solicit or consider outside information and opinions. *E.g., Ctr. for Biological Diversity v. Morgenweck*, 351 F.Supp.2d 1137 (D.Colo. 2004); *Wildearth Guardians v. U.S. Secretary of the Interior*, 2011 WL 1225547, *4, *7 (D. Idaho Mar. 28, 2011); *McCrary v. Gutierrez*, 2010 WL 520762 (N.D.Cal. Feb. 8, 2010).

Importantly, it is well established that a lower standard of evidence is required at the 90-day finding stage than is required to make a 12-month finding, because the question before the Service at that preliminary stage is whether the petitioned action *may be warranted*, not whether it *is warranted*. *E.g., Moden v. U.S. Fish and Wildlife Serv.*, 281 F.Supp.2d 1193, 1203–04 (D.Or. 2003) (concluding that "the standard for evaluating whether substantial information has been presented by an 'interested person' is not overly-burdensome, does not require conclusive information, and uses the 'reasonable person' to determine whether…action may be warranted."); *Humane Soc'y of the U.S. v. Pritzker*, 2014 WL 6946022, *5–8 (D.D.C. Nov. 14, 2014) (summarizing case law verifying the lower evidentiary standard for a 90-day finding and determining that the agency was arbitrary and capricious in its failure to apply the correct evidentiary standard where there was "conflicting evidence" regarding the species and the agency's "own conclusion regarding the need for more thorough analysis suggest[ed] that a reasonable person might conclude that a review of the status of the species concerned was warranted"); *Ctr. for Biological Diversity v. Kempthorne*, 2008 WL 659822, *9 (D. Ariz. Mar. 6, 2008) (holding that "the application of an evidentiary standard requiring conclusive evidence in the context of a 90-day review is arbitrary and capricious"); *Morgenweck*, 351 F.Supp.2d at 1141; *Colorado River Cutthroat Trout*, 448 F.Supp.2d at 176 (holding that the 90-day finding stage is intended to be a "threshold determination" and a "less searching review").

2.  **The Bone Cave Harvestman**

On September 6, 1988, the Service published a final rule to list as endangered five species of karst invertebrates known to occur only in Travis and Williamson counties, Texas, one of which was the BCH.[1] 53 Fed. Reg. 36029. Pursuant to the listing factors identified in the ESA, the Service provided the following justifications for the listing of these species as endangered:

> **Listing Factor A (the present or threatened destruction, modification, or curtailment of its habitat or range):** "The primary threat to the five species comes from the potential loss of habitat owing to ongoing developmental activities." At that time, the Service's assessment was directly related to "a major residential, commercial, and industrial development" that affected the entire known range of several of the species and a large portion of the habitat of the species we know today as BCH. The Service described the potential threats from development activities as including: collapsing or filling in caves during construction; the alteration of drainage patterns to caves (either increasing or decreasing water flow); increasing the flow of sediment, pesticides, fertilizers, and general urban run-off into caves; and increased human visitation and vandalism.
>
> **Listing Factor B (overutilization for commercial, recreational, scientific, or educational purposes):** The Service determined that "no threat from overutilization of these species is known to exist" at the time of listing; however, collection for scientific or educational purposes could become a threat if localities become generally known.
>
> **Listing Factor C (disease or predation):** The Service determined that increased human population exacerbates the "problems of predation by, and competition with, exotic (non-native) species," including sowbugs, cockroaches, and fire ants.
>
> **Listing Factor D (the inadequacy of existing regulatory mechanisms):** The Service determined that these species were threatened by a lack of existing regulatory protections, based on a finding that "there are currently no laws that protect any of these species or that directly address protection of their habitat."
>
> **Listing Factor E (other natural or manmade factors affecting its continued existence):** The Service discussed the limitations placed on these species by a lack of

---

[1] BCH is a pale orange harvestman with absent retina. Ubick and Briggs (1992:211) identified the species as extremely polymorphic, particularly in its troglomorphic characteristics. For example, BCH may have well developed cornea or the cornea may be reduced or absent altogether. Ubick and Briggs (1992:211) identified that the species is more troglomorphic in the northern reaches of its distribution. In other words, in the southern part of the range, individuals have partial corneas, while in the north, morphological evidence of any remnants of eye development is completely absent.

mobility from one habitat to another and stated that "moisture regimes, food supply, and other factors may also limit subsurface migrations." The Service identified changes to inner-cave climate from surface alterations and vandalism of caves as potential threats. In support of the 1988 final listing rule, the Service relied on only seven referenced data sources to substantiate the listing of the five species. Of these sources, only one source was less than ten years old at the time of the final rule, and only the Goodnight & Goodnight paper (1967) had any reference specific to *T. reddelli*. In the final rule, *T. reddelli* was confirmed in only five caves and believed to exist, but not confirmed, in a sixth. The known range of the species extended a distance of approximately 21 miles along the edge of the Edwards Plateau (75 square miles). The Service's decision to list *T. reddelli* (later identified as *T. reyesi*, or the BCH) was based on very limited information about the species (including basic taxonomy) and was prompted by concerns about potential adverse effects of development activities at a time when the link between such activities and actual effects on the species was largely unknown. Mentioning only the species' "naturally limited ability to colonize new habitats," the listing rule did not consider that new locations would be found or the species' range extended.

53 Fed. Reg. 36029, 36031.

Distilling down the listing rule, the listing decision was based on the following key assumptions: (1) a very small range and a handful of unprotected locations (with no expectation that further locations would be found); (2) a lack of regulations providing relative degrees of protection; and (3) predation and competition. Notably, at the time of the 1988 listing, BCH was considered a member of *Texella reddelli*, or the Bee Creek Cave Harvestman ("BCCH"). The BCH was later identified as a distinct species, and the Service addressed this taxonomic finding by issuing a corrected notice of listing to provide continued protection to the BCH. 58 Fed. Reg. 43818 (Aug. 18, 1993). The Service applied the 1998 justifications for listing to the BCH after the reclassification.

3. The Petition to Delist the Bone Cave Harvestman

On June 2, 2014, a group of petitioners[2] submitted to the Service a petition to delist the BCH. The petition (attached) provides substantial scientific information indicating that delisting may be warranted. The petition provides the current body of information on the BCH and documents more than 160 localities than were known at the time of listing. The petition also provides data demonstrating that the BCH's resilience to human activities is stronger than the Service had originally determined at the time of listing. The petition includes scientific support showing:

- Known localities have increased from five or six at the time of listing to 172 today.

---

[2] John F. Yearwood, Kathryn Heideman, Charles & Cheryl Shell, Walter Sidney Shell Management Trust, American Stewards of Liberty, and Steven W. Carothers.

- Significant conservation is in place with at least 94 known localities (55 percent of the total known localities) currently protected in preserves, parks, or other open spaces. There are more than an order of magnitude more protected localities than there were known localities at the time of the listing.

- Regulatory protections are afforded to most caves in Travis and Williamson counties via state laws and regulations and local ordinances. It matters not that these regulations are not specific to the BCH, so long as they have a collateral protective effect.

- Biologists continue to discover new, occupied localities, and this trend is likely to continue as more areas are explored and more caves are discovered.

The petition also contains a review of the ESA listing factors and provides support that:

- Development activities on the surface may not result in the significant loss or degradation of the subsurface habitat for *T. reyesi* as originally thought. Several examples of continued species persistence in developed areas include: Inner Space Caverns, Sun City caves, Three-Mile Cave, Four-Mile Cave, and Weldon Cave.

- Inner Space Caverns demonstrates that the species can persist in caves with frequent human visitation and may be more tolerant of related habitat modifications than originally believed.

- Recent studies suggest that fire ants may not present as significant or as lasting of a threat to the species as originally believed.

- The regulatory landscape includes a number of measures contributing to the conservation of the species outside of the protections afforded by the Endangered Species Act of 1973, as amended.

- The use of small voids, or "mesocaverns," within the geologic formations known to support occupied caves mitigates the potential threat of climate change.

The Petitioners conclude that delisting the BCH is warranted because the listing was clearly in error as to the perceived rarity and known extent of the BCH and on the basis of both: (1) significant conservation and regulatory efforts protective of the species; and (2) information and analysis indicating the existence and/or magnitude of previously identified threats do not support a conclusion that the species is at risk of extinction now or in the foreseeable future.

4. **The Negative Finding**

On June 1, 2015, the Service announced the Negative Finding concluding that the petition did not present substantial information indicating that the petitioned action may be warranted. 80 Fed. Reg. 30990. The Service identified its charge as follows: "We must consider

[the five listing factors] in delisting a species. We may delist a species according to 50 CFR 424.11(d) if the best available scientific and commercial data indicate that the species is neither endangered nor threatened for the following reasons: (1) the species is extinct; (2) the species is recovered; or (3) the original data for classification were in error."

As stated in Section 1 above, the standard for reaching a positive 90-day finding on a petition is a low bar; the petition must present substantial scientific information indicating the petitioned action may be warranted, meaning that the petition must present only "that amount of information that would lead a *reasonable person* to believe that the measure proposed in the petition *may* be warranted." 16 U.S.C. § 1534(b)(3)(A); 50 C.F.R. § 424.14(b)(1) (emphasis added). One can presume that this bar is low, in part, because a 90-day finding triggers no regulations or responsibilities, only further study. Throughout the Negative Finding, however, the Service made clear that it viewed the burden on the petitioner as proving recovery and, unsurprisingly, as proving the negative:

- "[T]he petition states that 94 karst preserve areas are currently providing significant conservation. However, many of the existing protected areas referenced in the petition are too small to meet our preserve design recommendations....[A]t most of the remaining locations...we are lacking information to confirm that they meet the preserve design criteria....Hence, we are unsure whether those areas have adequate undeveloped acreage, management, or protection mechanisms to ensure the long-term protection and survival of the [BCH]." 80 Fed. Reg. at 30993.

- "The petition asserts that four additional locations are known since the time of the 5-year review. However, the petition does not provide adequate information that would support whether these four additional locations are in a condition to meet preserve design recommendations....Regardless, the amount of protected karst fauna area still falls short of the criteria for reclassification from endangered to threatened." 80 Fed. Reg. at 30993.

- "The current petition asserts that 'Development activities on the surface may not result in the significant loss or degradation of habitat for *T. reyesi* as originally thought' and suggests that evidence of this is the species persistence in caves surrounded by developed areas....However, the observation of the species in these locations does not mean their populations at these locations are thriving or can withstand the long-term impacts from development activities that are expected to occur....Information adequate to detect population trends for this species is not readily available and was not provided in the petition." 80 Fed. Reg. at 30993.

- "The commercial cave known as Inner Space Caverns is another example the petition provided where the [BCH] continues to persist in a developed area. Although the [BCH] may be present at Inner Space Caverns, this does not ensure their populations are robust and secure; they may still be declining, and are at risk due to competition with surface-dwelling invertebrates and other threats associated with development such as the potential for contamination....The petition failed to provide any data adequate to assess

trends in the karst invertebrate population in relation to the time (duration and frequency) that they have been exposed to the artificial lighting." 80 Fed. Reg. at 30994.

- "While the petition did discuss some new ordinances that appear to have been put in place since the time of listing, we do not have enough information to indicate whether or not these State and local ordinances provide enough protection from all threats to the [BCH]." 80 Fed. Reg. at 30995.

- "The petition provided no trend analysis to indicate that this species can withstand the threats associated with development or climate change over the long term." 80 Fed. Reg. at 30996.

As evidenced by the above quotes, the Negative Finding amounts to a ridiculous exercise in nitpicking. It is simply incontestable that the following facts stated in the petition indicate that delisting may be warranted:

- A 1566% increase in known locations and a 97% increase in range since the species was listed;

- Level of existing protection for approximately half the known locations, many in Service-approved circumstances;

- Strong state and local regulations giving collateral protections to the BCH;

- A reduced concern for predation and competition; and

- An ongoing increase in the number of known locations, with virtually no documented localized extirpations.

It is evident, however, from the Negative Finding that the Service applied the wrong standard. As set forth in greater detail in Section 6, the Service has misapplied the standard set forth in the ESA and its regulations.

5. **The Announcement of a Five-year Status Review**

The very next statutorily prescribed step under the ESA is to gather more information to more thoroughly evaluate the status of the species in the 12-month review stage. 16 U.S.C. §§ 1533(b)(3)(B); 50 C.F.R. 424.14(b)(3). Interestingly, instead of making a positive 90-day finding that would trigger a status review, the Service chose to gather more information under the guise of a standard 5-year review. 80 Fed. Reg. 20241 (Apr. 15, 2015). Importantly, the 5-year review process is independent from the process for review of citizen-initiated petitions, and the completion of a 5-year review does not relieve the Service of the duty to act appropriately on the petition, consistent with the regulatory standard for agency review of petitions. *See, e.g.,*

*Coos Cnty. Board of Cnty. Comm'rs v. Kempthorne*, 804–08 (recognizing the two distinct Service decision-making methods of the petition review process and the 5-year review process).

6.   **Violations of the ESA and Administrative Procedure Act**

The scientific information presented in the petition demonstrates that the original listing of the BCH was a grievous error and that the BCH should be delisted. The Service has acted arbitrarily and capriciously in violating the ESA's mandatory duties by (1) failing to limit review to the petition and documents already in the Service's files and instead attempting to gather information through a newly-announced five-year status review; (2) applying the wrong evidentiary standard and failing to apply the "substantial information" standard; and (3) ignoring, misconstruing, and/or subverting scientific information. This runs counter to the Service's own interpretation of the ESA and its customary statement in 90-day findings that, "as the Act and regulations contemplate, at the 90-day finding, we [the Service] accept the petitioner's sources and characterizations of the information unless we have specific information to the contrary." *Colorado River Cutthroat Trout v. Kempthorne*, 448 F.Supp.2d 170, 176 n.4 (citing the Service's statements in numerous 90-day findings that the agency does not conduct additional research or subject the petition to rigorous critical review at the 90-day finding stage). The Administrative Procedure Act ("APA") states that a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A), (D). In applying the wrong standard, the Service has violated the APA.

A glaring omission of the Service's Negative Finding is its steadfast failure ever to confront the primary basis for the petition—that the original data for classification of the BCH were in error. The Negative Finding acknowledges that delisting is warranted "if the best available scientific and commercial data indicate that the species is neither endangered nor threatened for the following reasons: (1) The species is extinct; (2) the species is recovered; or (3) the original data for classification were in error." The Negative Finding further recognizes that "according to 50 CFR 424.11(d)(3), a species may be delisted when subsequent investigations ''show that the best scientific and commercial data available when the species was listed, or the interpretation of such data, were in error.'' Yet, notwithstanding the substantial, indisputable evidence that the listing was indeed based on erroneous data and interpretations, nowhere in the Negative Finding does the Service address this basis for the petition. Rather, the Negative Finding simply pretends that the listing suffered from no such errors and limits its analysis to the question whether the BCH has recovered within the meaning of the 1994 recovery plan. This approach is legally and factually defective for several reasons.

First, there can be no dispute that the original data for classification of the BCH as endangered were in error. The final rule listing the BCCH in 1998 in stated that "Tooth, Amber, Kretschmarr, Kretschmarr Salamander, McDonald, and Root Caves are in an area for which a major residential, commercial, and industrial development has been proposed, and preliminary clearing and digging has begun. This area includes the entire known ranges of the Tooth Cave pseudoscorpion, the Tooth Cave spider, and the Tooth Cave ground beetle, all but one known

locality of the Kretschmarr Cave mold beetle, and a large portion of the habitat of the Bee Creek Cave harvestman." 53 Fed. Reg. 36031. The Service further explained that "the Bee Creek Cave harvestman lives in Tooth, Bee Creek, McDonald, Weldon, and Bone Caves in Travis and Williamson Counties, Texas. The Texella reported by Reddell (1984) from Root Cave, Travis County, may also be this species." 53 Fed. Reg. 36030.

After the BCCH was listed, the Service decided in 1993 that the species was in fact two closely related species, one of which was and is the BCH. Without following the procedures required under Section 4 of the ESA to list the BCH as a distinct species, the agency simply split the one species into two by fiat and assigned the original listing classification to both, which means the original basis for listing the BCCH is the only basis ever offered for listing of the BCH. The Service nonetheless explained at the time of this "listing" of the BCH that "both of these species continue to face the same general threats identified in the original listing of the Bee Creek Cave harvestman. Their combined ranges, *including newly discovered localities*, extend about 31 miles (50 km) along the edge of the Edwards Plateau in Travis and Williamson counties." 58 Fed. Reg. 43819 (emphasis added). The Service also explained in 1994 "the Bee Creek Cave harvestman was believed to occur in five caves in Travis and Williamson counties at the time of listing," 59 Fed. Reg. 11756, but that "the Bone Cave harvestman is currently known from about 69 locations (60 confirmed, 9 tentative) along a 40-km (25-mi) distance in Travis and Williamson counties, Texas." 59 Fed. Reg. 11755.

In other words, the Service believed in 1988, when it listed the species it thought at the time was just the BCCH (but in fact was the BCCH and BCH), that the species existed in only five caves. Hence, for over two decades the Service has known that its original basis for listing the BCCH, and thus the BCH, was in error. When the Service determined that the BCH was not in fact the BCCH, it could not magically cure its error by simply acting as if the basis for the BCH listing was not based entirely on the basis for the BCCH listing. The Service has never offered any basis for listing the BCH other than its original basis for listing the BCCH.

This indisputable error in the original classification decision alone warrants delisting. The three bases for delisting a species are independent and each is sufficient to support delisting. If the original data for classification were in error, delisting is warranted. The Service cannot sidestep this consequence by pointing to the BCH recovery plan and assessing the status of its implementation, because the recovery plan is itself based on the erroneous listing classification. The existence of a recovery plan does not eliminate the erroneous basis for the listing. Nor can the 2007 5-year review cure the error, as it was not prepared under the procedural and substantive requirements of a Section 4 listing rulemaking. A 5-year review cannot substitute for or supplant the basis of an original listing classification. Whatever the Service believes the status of the BCH to be today, it cannot escape the fact that the original listing was based on erroneous data. Preparation of the recovery plan and conducting the 5-year review are not substitutes for the procedures required by Section 4.

A 90-day finding focused only on the Service's determination of whether the species has "recovered" also cannot cure the defective original classification, because the notion of

"recovery" of an improperly listed species is nonsensical. Nor can a 90-day finding reviewing the listing criteria satisfy the procedures required under Section 4 for a petitioned action that may be warranted—a 90-day finding is not a substitute for a 12-month finding. Rather, because no reasonable person could conclude that the best scientific and commercial data available when the species was listed, or the interpretation of such data, were not in error, the Service as a matter of law was required to find that the petitioned action may be warranted and must therefore grant the Petition and move to the next step of conducting a full 12-month finding process pursuant to the procedures laid out in Section 4 of the ESA.

Finally, in addition to the error in classification and the improper focus on recovery and as described in Section 3, the Petition also demonstrates several other respects in which the listing was in error. The information provided in the Petition far exceeds the regulatory standard that a petition must merely present substantial information that the petitioned action *might* be warranted. In its Negative Finding, the Service inexplicably looked to the petition to *prove* that the BCH had recovered. That is clearly the wrong standard, and the Service's Negative Finding must fail as being arbitrary, capricious, an abuse of discretion, and contrary to law.

For at least these reasons, in issuing its Negative Finding, the Service violated its non-discretionary duties under the ESA. The Negative Finding was and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA within the meaning of the Administrative Procedure Act. 5 U.S.C. §§ 706(2). We appreciate your time and attention to this matter.

Sincerely,

Alan M. Glen
Partner
Nossaman LLP

cc: Dan Byfield
Margaret Byfield

**Patterson, Mandy**

| | |
|---|---|
| **From:** | trackingupdates@fedex.com |
| **Sent:** | Tuesday, September 15, 2015 8:45 AM |
| **To:** | Patterson, Mandy |
| **Subject:** | FedEx Shipment 781325576047 Delivered |

_____

This tracking update has been requested by:

| | |
|---|---|
| Company Name: | Nossaman LLP |
| Name: | Alan Glen |
| E-mail: | aglen@nossaman.com |
| Message: | PSShip eMail Notification |

_____

Our records indicate that the following shipment has been delivered:

| | |
|---|---|
| Reference: | 501774.0002.AMG1 |
| Ship (P/U) date: | Sep 14, 2015 |
| Delivery date: | Sep 15, 2015 9:42 am |
| Sign for by: | Signature Release on file |
| Delivery location: | WASHINGTON, DC |
| Service type: | FedEx Priority Overnight |
| Packaging type: | FedEx Envelope |
| Number of pieces: | 1 |
| Weight: | 0.50 lb. |
| Special handling/Services: | No Signature Required |
| | Deliver Weekday |
| Tracking number: | 781325576047 |

| Shipper Information | Recipient Information |
|---|---|
| Alan Glen | Sally Jewell |
| Nossaman LLP | U.S. Department of Interior |
| 919 Congress Avenue | 1849 C ST NW |
| Suite 1050 | WASHINGTON |
| Austin | DC |
| TX | US |
| US | 20240 |
| 78701 | |

Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 8:45 AM CDT on 09/15/2015.

To learn more about FedEx Express, please visit our website at fedex.com.

1

All weights are estimated.

To track the status of this shipment online, please use the following:
https://www.fedex.com/insight/findit/nrp.jsp?tracknumbers=781325576047&language=en&opco=FX&clientype=ivpodalrt

This tracking update has been sent to you by FedEx on the behalf of the Requestor noted above. FedEx does not validate the authenticity of the requestor and does not validate, guarantee or warrant the authenticity of the request, the requestor's message, or the accuracy of this tracking update.  For tracking results and fedex.com's terms of use, go to fedex.com.

Thank you for your business.

**Patterson, Mandy**

| | |
|---|---|
| **From:** | trackingupdates@fedex.com |
| **Sent:** | Tuesday, September 15, 2015 8:55 AM |
| **To:** | Patterson, Mandy |
| **Subject:** | FedEx Shipment 781325656004 Delivered |

_____

This tracking update has been requested by:

Company Name:     Nossaman LLP
Name:             Alan Glen
E-mail:           aglen@nossaman.com

Message:          PSShip eMail Notification
_____

Our records indicate that the following shipment has been delivered:

Reference:              501774.0002.AMG1
Ship (P/U) date:        Sep 14, 2015
Delivery date:          Sep 15, 2015 9:52 am
Sign for by:            Signature Release on file
Delivery location:      WASHINGTON, DC
Service type:           FedEx Priority Overnight
Packaging type:         FedEx Envelope
Number of pieces:       1
Weight:                 0.50 lb.
Special handling/Services:   No Signature Required
                        Deliver Weekday

Tracking number:        781325656004

Shipper Information            Recipient Information
Alan Glen                      Daniel Ashe
Nossaman LLP                   U.S. Fish & Wildlife Service
919 Congress Avenue            1849 C ST NW
Suite 1050                     WASHINGTON
Austin                         DC
TX                             US
US                             20240
78701

Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 8:54 AM CDT on 09/15/2015.

To learn more about FedEx Express, please visit our website at fedex.com.

1

All weights are estimated.

To track the status of this shipment online, please use the following:
https://www.fedex.com/insight/findit/nrp.jsp?tracknumbers=781325656004&language=en&opco=FX&clientype=ivpodalrt

This tracking update has been sent to you by FedEx on the behalf of the Requestor noted above. FedEx does not validate the authenticity of the requestor and does not validate, guarantee or warrant the authenticity of the request, the requestor's message, or the accuracy of this tracking update.  For tracking results and fedex.com's terms of use, go to fedex.com.

Thank you for your business.

**Patterson, Mandy**

| | |
|---|---|
| **From:** | trackingupdates@fedex.com |
| **Sent:** | Tuesday, September 15, 2015 11:29 AM |
| **To:** | Patterson, Mandy |
| **Subject:** | FedEx Shipment 781325679082 Delivered |

_____

This tracking update has been requested by:

| | |
|---|---|
| Company Name: | Nossaman LLP |
| Name: | Alan Glen |
| E-mail: | aglen@nossaman.com |
| Message: | PSShip eMail Notification |

_____

Our records indicate that the following shipment has been delivered:

| | |
|---|---|
| Reference: | 501774.0002.AMG1 |
| Ship (P/U) date: | Sep 14, 2015 |
| Delivery date: | Sep 15, 2015 10:22 am |
| Sign for by: | K.ARNOLD |
| Delivery location: | ALBUQUERQUE, NM |
| Delivered to: | Receptionist/Front Desk |
| Service type: | FedEx Priority Overnight |
| Packaging type: | FedEx Envelope |
| Number of pieces: | 1 |
| Weight: | 0.50 lb. |
| Special handling/Services: | No Signature Required |
| | Deliver Weekday |
| Tracking number: | 781325679082 |

| Shipper Information | Recipient Information |
|---|---|
| Alan Glen | Benjamin Tuggle |
| Nossaman LLP | U.S. Fish & Wildlife Service |
| 919 Congress Avenue | 500 GOLD AVE SW |
| Suite 1050 | ALBUQUERQUE |
| Austin | NM |
| TX | US |
| US | 87102 |
| 78701 | |

Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 11:29 AM CDT on 09/15/2015.

To learn more about FedEx Express, please visit our website at fedex.com.

1

All weights are estimated.

To track the status of this shipment online, please use the following:
https://www.fedex.com/insight/findit/nrp.jsp?tracknumbers=781325679082&language=en&opco=FX&clientype=ivpodalrt

This tracking update has been sent to you by FedEx on the behalf of the Requestor noted above. FedEx does not validate the authenticity of the requestor and does not validate, guarantee or warrant the authenticity of the request, the requestor's message, or the accuracy of this tracking update. For tracking results and fedex.com's terms of use, go to fedex.com.

Thank you for your business.