IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| AMERICAN STEWARDS OF LIBERTY, *et al*., | ) ) ) |
| Plaintiffs, | ) ) |
| JOHN YEARWOOD and WILLIAMSON COUNTY, TEXAS, | ) ) ) |
| Plaintiff-Intervenors, | ) ) |
| v. | ) ) Civil No. 1:15-cv-01174-LY |
| DEPARTMENT OF INTERIOR, *et al*., | ) ) |
| Defendants, | ) ) |
| CENTER FOR BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE, and TRAVIS AUDUBON, | ) ) ) ) |
| Defendant-Intervenors. | ) |

**DEFENDANT-INTERVENORS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant-Intervenors

Center for Biological Diversity, Defenders of Wildlife, and Travis Audubon respectfully move

this Court to grant summary judgment to Defendant-Intervenors on all claims Plaintiffs raised in

this case. In support, Defendant-Intervenors submit the following Memorandum in Support of

their Cross-Motion for Summary Judgment and in Response to Plaintiffs' Motion for Summary

Judgment (ECF. No. 132).

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

FACTUAL AND LEGAL BACKGROUND ...............................................................................1

   I.     THE BONE CAVE HARVESTMAN .............................................................................1

   II.    THE ENDANGERED SPECIES ACT ............................................................................2

STANDARD OF REVIEW ..........................................................................................................4

ARGUMENT .................................................................................................................................4

   I.     THE BONE CAVE HARVESTMAN CONTINUES
        TO FACE SEVERE THREATS .....................................................................................4

   II.    ANY DOUBTS REGARDING THE THREATS FACING
        THE BONE CAVE HARVESTMAN MUST BE CONSTRUED
        IN ITS FAVOR ..............................................................................................................8

CONCLUSION..............................................................................................................................9

# TABLE OF AUTHORITES

## CASES

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988)........................................................8

*Ctr. for Biological Diversity v. BLM*, 422 F. Supp. 2d 1115 (N.D. Cal. 2006)..............8

*Ctr. for Biological Diversity v. Morgenweck*, 351 F. Supp. 2d 1137 (D. Colo. 2004)...................4

*Luminant Generation Co., LLC v. EPA*, 675 F.3d 917 (5th Cir. 2012)...........................4

*Miss. River Basin Alliance v. Westphal*, 230 F.3d 170 (5th Cir. 2000) .........................4

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ......................................................2, 3

## STATUES

5 U.S.C. § 706(2)(A)..........................................................................................4

16 U.S.C. § 1531(b) ...........................................................................................2

16 U.S.C. § 1532(3) ...........................................................................................2

16 U.S.C. § 1533(a)(1) .......................................................................................3

16 U.S.C. § 1533(a)(3)(A)(i)...............................................................................3

16 U.S.C. § 1533(b)(1) .......................................................................................3

16 U.S.C. §1533(b)(2) ........................................................................................3

16 U.S.C. § 1533(b)(3)(A)...............................................................................1, 3

## FEDERAL REGULATIONS

50 C.F.R. § 424.12(b)(1) (2014) ......................................................................3, 4

50 C.F.R. § 424.12(b)(2) (2014) .........................................................................4

50 C.F.R. § 424.14(h)(i)......................................................................................3

**LEGISLATIVE HISTORY**

H.R. Rep. No. 96-697, at 12 (1979) (Conf. Rep.),
    *as reprinted in* 1979 U.S.C.C.A.N. 2572, 2576......................................................................8

H.R. Rep. No. 93-412, pp. 4–5 (1973)...........................................................................................8

# INTRODUCTION[1]

The Bone Cave harvestman ("harvestman"), *Texella reyesi*, is endemic to Travis and Williamson counties in Central Texas. This rare cave species was originally listed under the Endangered Species Act ("ESA" or "the Act") in 1998. 53 Fed. Reg. 36,029 (Sept. 16, 1988). At the time, the U.S. Fish and Wildlife Service ("the Service") found that the species required "the maximum possible protection provided by the Act because their extremely small, vulnerable, and limited habitats" were under "pressure[ ] from economic and population growth." R004783.[2]

Despite the harvestman's highly uncertain future, Plaintiffs petitioned to remove ESA protections for the harvestman, a petition that the Service appropriately rejected. Because Plaintiffs failed to provide "substantial scientific or commercial information," 16 U.S.C. § 1533(b)(3)(A), indicating that delisting the harvestman may be warranted, their case must be dismissed.

# FACTUAL AND LEGAL BACKGROUND

## III.   THE BONE CAVE HARVESTMAN

The Bone Cave harvestman is an ancient troglobite endemic to the karst limestone caves of Travis and Williamson Counties in central Texas. R005238. Blind and pale orange in color, the harvestman has long appendages and spends its entire life underground, *id.*, feeding on other arthropods and nutrients that filter from the surface ground above. M003411. Although they never venture outside of their caves, the fate of the harvestman and its subterranean network of limestone is inexorably bound with the fate of the surface. *Id.* Anything that adversely impacts

---

[1] For the sake of brevity, Defendant-Intervenors incorporate the Statutory Background and Factual and Procedural Background as set forth in Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment, ECF No. 144.

[2] All record documents are referenced by their Bates numbers and are attached to this motion as exhibits.

the surface—*e.g.*, like the sprawling housing developments that pave, pollute, and re-contour the surface—will ultimately adversely impact the caves and the harvestmen below. *See, e.g.*, R001735, R004945, R004957.

Since it was listed in 1988, the primary threats to the harvestman have always been:

> 1) habitat loss to development; 2) cave collapse or filling; 3) alteration of drainage patterns; 4) alteration of surface plant and animal communities, including the invasion of exotic plants and predators (i.e. the red-imported fire ant (RIFA), *Solenopsis invicta*), changes in competition for limited resources and resulting nutrient depletion, and the loss of native vegetative cover leading to changes in surface microclimates and erosion; 5) contamination of the habitat, including groundwater, from nearby agricultural disturbance, pesticides, and fertilizers; 6) leakages and spills of hazardous materials from vehicles, tanks, pipelines, and other urban or industrial runoff; and 7) human visitation, vandalism, and dumping; mining; quarrying (limestone); or, blasting above or in caves.

R000317. Contrary to Plaintiffs' assertions, these threats remain. M003420.

## IV.   THE ENDANGERED SPECIES ACT

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation[,]" *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978) [hereinafter "TVA"], providing "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). "Conservation" means the "use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id.* § 1532(3).

The plain language of the Act, and its history and structure, embodies Congress's intent that "endangered species … be afforded the highest of priorities." *TVA*, 437 U.S. at 174. Congress was concerned not just with protecting charismatic megafauna, but also about

2

protecting the "*unknown* uses that endangered species might have and about the *unforeseeable* place such creatures may have in the chain of life on this planet." *Id.* at 178–79.

Section 4(a) of the ESA requires the Secretary to list or delist species based on "best scientific data available" and any of the following factors:

(A)   the present or threatened destruction, modification, or curtailment of its habitat or range;
(B)   overutilization for commercial, recreational, scientific, or educational purposes;
(C)   disease or predation;
(D)   the inadequacy of existing regulatory mechanisms; or
(E)   other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1), (a)(3)(A)(i), (b)(1)–(2). Interested persons may submit a petition to the Service to request classification of species as endangered or threatened. *Id.* § 1533(b)(3)(A). Within 90 days, the Service must find "whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.* When Plaintiffs submitted their petition, the implementing regulations for section 4 listing determinations defined "substantial information" (on which a 90-day finding is based) as the "amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. § 424.12(b)(1) (2014).[3] When considering a petition, the Service must evaluate it for a "detailed narrative justification" for the requested listing or delisting and a robust description of the "numbers and distribution of the species involved," "any threats faced by the species," and whether the petition "[p]rovides information

_____

[3] The current version of the relevant regulation defines "substantial scientific or commercial information" as "credible scientific or commercial information in support of the petition's claims such that a reasonable person conducting an impartial scientific review would conclude that the action proposed in the petition may be warranted. Conclusions drawn in the petition without the support of credible scientific or commercial information will not be considered 'substantial information.'" 50 C.F.R. § 424.14(h)(i).

regarding the status of the species over all or a significant portion of its range. . . ." *Id.* at §

424.12(b)(2) (2014).[4]

## STANDARD OF REVIEW

The validity of a petition to delist an endangered species is reviewed subject to the

Administrative Procedure Act's standards of review. *Ctr. for Biological Diversity v.*

*Morgenweck*, 351 F. Supp. 2d 1137, 1140 (D. Colo. 2004). The reviewing court must set aside

agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." 5 U.S.C. § 706(2)(A); Pls. Br. 18; Defs. Br. 18. Courts must be particularly

deferential to agency determinations made within the scope of the agency's expertise. *See Miss.*

*River Basin Alliance v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000). "Review of agency action

under § 706(2)'s 'arbitrary or capricious' standard is limited to the record before the agency at

the time of its decision." *Luminant Generation Co., LLC v. EPA*, 675 F.3d 917, 925 (5th Cir.

2012).

## ARGUMENT

## I.   THE BONE CAVE HARVESTMAN CONTINUES TO FACE SEVERE THREATS

The petition to delist the harvestman does not warrant further consideration because none

of the threats facing the species have abated since its listing. If anything, threats have increased.

M003420. Plaintiffs' petition and argument rests on little more than the fact that additional

occupied caves are now known than at the time of listing. While this fact may seem superficially

---

[4] The regulations also required the Service to consider whether the petition "(i) [c]learly indicates
the administrative measure recommended and gives the scientific and any common name of the
species involved; . . . and (iv) [i]s accompanied by appropriate supporting documentation in the
form of bibliographic references, reprints of pertinent publications, copies of reports or letters
from authorities, and maps." 50 CFR § 424.14(b)(2)(i) (2014).

compelling, a deeper analysis of the available scientific data shows why the Service reasonably concluded the harvestman is still endangered.

Fundamentally, habitat loss and degradation still severely threaten the harvestman. The harvestman's karst habitat takes millions of years to form and cannot be recreated once destroyed. R004949; R004973. Regardless of the total number of known occupied caves, cave habitat is reduced by approximately ten percent every ten years. R004955. This trend of habitat loss is likely to be exacerbated with increased urban development, *id.*, especially given that Travis County's population is expected to nearly double in size from 2010 to 2050. M003412. Exceeding even that rapid growth, Williamson County's population is projected to nearly quadruple and grow by over one and a half million people from 2010 to 2050. *Id.*

Some of the impacts from development are straightforward and direct, such as the flooding, filling in, or collapse of occupied caves. *See, e.g.*, R004782, R004955–56. Beyond simple destruction, increased development in Travis and Williamson counties also degrades and adversely modifies the harvestman's habitat, R001735, by altering drainage patterns; increasing the flow of sediment, pesticides, fertilizers, and urban runoff into caves; and increasing human visitation and vandalism. M003407.

Asserting that habitat loss and degradation do not impact the harvestman, Plaintiffs rely on anecdotal evidence that the harvestman "persist alongside development activities." M003483. But while Plaintiffs assert there is "no evidence" that "modification of[ ] the cave environment presents a direct threat" to the harvestman, M003484, the record refutes this claim. As the Service has explained, this anecdotal evidence fails to provide substantial information that the harvestman is "thriving or can withstand the long-term impacts from development activities . . . as discussed in the listing rule, recovery plan, and 5-year status review for the [harvestman]. In

addition, increased development provides greater opportunities for contamination events such as pipeline leaks or hazardous material spills." M003408. In fact, "harvestman populations may be declining or threatened even though they are still observed at a specific site." M003408. Indeed, the harvestman's continued persistence can be explained by its relatively long life span, which "distorts the view of what is happening to the ecosystem" and can mask detection of problems like unsustainably low reproductive rates. M003408, R001776.

Even though the species has persisted to date, its continued persistence is not evidence that the harvestman and the continued development of its habitat can co-exist indefinitely. Not only does development "destroy or alter the surface plant and animal communities on which karst invertebrates depend," leading to "dramatic shifts in the available food supply," M003411, but it also increases the susceptibility of the species to catastrophic stochastic events such as pipeline leaks or hazardous material spills. M003408, M003419. And even if the number of known occupied caves has increased since listing, the range of the harvestman is still "severely limited," M003416, leading to a "greater overall risk of extinction." M003419. The harvestman is found nowhere outside the limits of Travis and Williamson counties, and, unlike some endangered species, it lacks the ability to colonize new habitats. R000320, R004783. Even if the rate of habitat loss is less than what the Service once feared, the harvestman still faces a likelihood of imminent extinction as "[t]heir low reproductive rates, ecological specialization, and other factors, make [the harvestman] especially vulnerable to habitat destruct, fire ant infestations, pollution, and other factors." R004898.

In addition, Plaintiffs cherry-pick evidence in support of their contentions. For instance, Plaintiffs assert that the impacts from red imported fire ants are unsupported, relying on Morrison (2002). M003487. But Morrison carefully clarified that "'it is quite likely that red

imported fire ants did contribute directly or indirectly to the disappearance or reduction in numbers of species' and that their study 'should not be interpreted as an indication that detrimental effects of invasive ants will simply disappear with time.'" M003414.

Similarly, Plaintiffs assert that regulatory mechanisms put in place since listing will ensure that the harvestman "is not likely to return to a vulnerable status following listing," M003489, but the Service notes that the patchwork of existing state and local regulatory mechanisms is inadequate and fails to provide the same robust protections the ESA provides. M003414–16. Some of the regulations even potentially harm the species by "[s]ealing off cave entrances . . . blocking off water (leading to drying) and nutrient input to the [harvestman's] habitat." M003416. Finally, Plaintiffs simply failed to provide the Service with enough information regarding these regulatory mechanisms for the Service to determine that the regulatory mechanisms would adequately protect the harvestman. M003414–15.

Plaintiffs also make only a passing attempt to assert that climate change does not impact the harvestman. M003495. Even if the harvestman's cave habitat has some natural resistance to climate change, the Service found that the harvestman will be impacted by "[i]ncreased and/or more severe storms, . . . prolonged periods of high temperatures and drought between rainfall events, . . . [and] flooding. . . ." M003418. This, in turn, threatens the harvestman by "[a]ffect[ing] the amount and timing of [available] nutrients" and increasing potential desiccation from lack of moisture during drought. *Id.* Climate change also increases the likely stochastic events, such as severe storms, further imperiling the species. M003418–19.

Cumulatively, the record demonstrates that the harvestman still faces grave threats within its extremely limited range. Plaintiffs have not met their burden to present substantial scientific information indicating that the delisting of the harvestman may be warranted. The lack

of information does not minimize Plaintiffs' burden. In fact, in the absence of substantial information demonstrating that delisting may be warranted, the Service must deny the petition. Therefore, the Service's decision was neither arbitrary nor capricious.

## II.   ANY DOUBTS REGARDING THE THREATS FACING THE BONE CAVE HARVESTMAN MUST BE CONSTRUED IN ITS FAVOR

Plaintiffs, however, maintain that anecdotal evidence of persistence and a lack of demographic data regarding population trends compels the Service to find that the increased number of known occupied caves presents "substantial evidence" that the harvestman may be eligible for delisting. Pls. Br. 19–22. But in the face of inconclusive evidence, the "benefit of the doubt" should go to the species. H.R. Rep. No. 96-697, at 12 (1979) (Conf. Rep.), *as reprinted in* 1979 U.S.C.C.A.N. 2572, 2576; *see also Ctr. for Biological Diversity v. BLM*, 422 F. Supp. 2d 1115, 1135 (N.D. Cal. 2006) (finding that until more was known regarding impacts to a listed plant species, the Service's biological opinion failed to "give the benefit of the doubt to the species") (citing *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)). This upholds the "[t]he institutionalized caution" lying at "the heart" of the ESA. H.R. Rep. No. 93-412, pp. 4–5 (1973). In line with this principle, the Service's decision to reject the Plaintiffs' petition followed this "precautionary approach, which provides guidance to avert irreversible risk when facing uncertainty." M003403.

Such a precautionary approach is especially important for a species like the harvestman with a small population size and a small range. M003419. These factors greatly increase the species' risk of extinction and reduce the window of time for corrective action needed to prevent extirpation. *See id.* With the loss of federal protections, the harvestman would face increased threats that may cause irreversible harm to its fragile population and habitat.

8

## CONCLUSION

For these reasons and others expressed in the Federal Defendants' brief, Defendant-Intervenors respectfully ask this Court to grant their Cross-Motion for Summary Judgment, deny Plaintiffs' motion, and dismiss Plaintiffs' complaint with prejudice.

Dated: December 21, 2017                    Respectfully submitted,

/s/ Ryan Adair Shannon
Ryan Adair Shannon (*Pro Hac Vice*)
(Oregon Bar No. 155537)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211-0374
Phone: (214) 476-8755
Fax: (503) 283-5528
Email: rshannon@biologicaldiversity.org

/s/ Jason C. Rylander
Jason C. Rylander (*Pro Hac Vice*)
(Virginia Bar No. 45827)
DEFENDERS OF WILDLIFE
1130 17th Street, N.W.
Washington, D.C. 20036
Telephone: (202) 682-9400
Fax: (202) 682-1331
Email: jrylander@defenders.org

Jared Margolis (*Pro Hac Vice*)
(Oregon Bar No. 146145)
CENTER FOR BIOLOGICAL DIVERSITY
2852 Willamette Street #171
Eugene, OR 97405
Phone: (802) 310-4054
Fax: (202) 682-1331
Email: jmargolis@biologicaldiversity.org

Charles W. Irvine
(Texas Bar No. 24055716)
IRVINE & CONNER PLLC
4709 Austin St.
Houston, TX 77004
Phone: (713) 533-1704
Fax: (713) 524-5165
Email: charles@irvineconner.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 21, 2017, a true and correct copy of Defendant-Intervenors' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment was electronically filed with the Clerk of Court using CM/ECF. Copies of the foregoing document will be served upon interested counsel via transmission of Notices of Electronic Filing generated by CM/ECF.

Dated: December 21, 2017                    Respectfully submitted,

                                            */s/ Ryan Adair Shannon*
                                            Ryan Adair Shannon (*Pro Hac Vice*)
                                            (Oregon Bar No. 155537)
                                            CENTER FOR BIOLOGICAL DIVERSITY
                                            P.O. Box 11374
                                            Portland, OR 97211-0374
                                            Phone: (503) 283-5474 x 407
                                            Email: rshannon@biologicaldiversity.org

10