IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| AMERICAN STEWARDS OF LIBERTY, CHARLES SHELL, CHERYL SHELL, WALTER SIDNEY SHELL MANAGEMENT TRUST, KATHRYN HEIDEMANN, ROBERT V. HARRISON, SR., JOHN YEARWOOD, AND WILLIAMSON COUNTY, TEXAS, PLAINTIFFS, | § § § § § § § § § § | |
| JOHN YEARWOOD AND WILLIAMSON COUNTY, TEXAS, PLAINTIFF-INTERVENORS, | § § § § § | |
| V. | § § | CAUSE NO. 1:15-CV-1174-LY |
| DEPARTMENT OF THE INTERIOR, UNITED STATES FISH AND WILDLIFE SERVICE, SALLY JEWELL, DANIEL M. ASHE, BENJAMIN N. TUGGLE, CENTER FOR BIOLOGICAL DIVERSITY, TRAVIS AUDUBON, AND DEFENDERS OF WILDLIFE, DEFENDANTS, | § § § § § § § § § § | |
| CENTER FOR BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE, AND TRAVIS AUDUBON, DEFENDANT-INTERVENORS. | § § § § | |

## MEMORANDUM OPINION AND ORDER

Before the court in the above-styled and numbered cause are Plaintiffs' Motion for Summary Judgment filed October 5, 2017 (Dkt. No. 132), Plaintiff-Intervenors' Motion for Summary Judgment filed October 10, 2017 (Dkt. No. 133), Amicus-Curiae Brief of Mountain States Legal Foundation in Support of Plaintiff-Intervenors' Motion for Summary Judgment filed October 16, 2017 (Dkt. No. 136), Brief of Texas as Amicus Curiae in Support of Intervenor-Plaintiffs' Motion for Summary Judgment filed October 6, 2017 (Dkt. No. 137), Federal

Defendants' Cross Motion for Summary Judgment & Opposition to Plaintiffs' Motion for Summary Judgment filed December 15, 2017 (Dkt. Nos. 142 & 144), Federal Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiff-Intervenors' Motion for Summary Judgment filed December 15, 2017 (Dkt. Nos. 145 & 146), Defendant-Intervenors' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment filed December 21, 2017 (Dkt. No. 147 & 148), Federal Defendants' Response to Amici Curiae Briefs of Mountain States Legal Foundation and Texas filed December 22, 2017 (Dkt. Nos. 149 & 150), Defendant-Intervenors' Cross-Motion for Summary Judgment and Opposition to Plaintiff-Intervenors' Motion for Summary Judgment filed December 22, 2017 (Dkt. Nos. 151 & 152), Plaintiff-Intervenors' Combined Reply in Support of Motion for Summary Judgment and Opposition to Federal Defendants and Defendant-Intervenors' Cross-Motions for Summary Judgment filed January 19, 2018 (Dkt. Nos. 154 & 155), Plaintiffs' Reply to Responses to Plaintiffs' Motion for Summary Judgment filed January 19, 2018 (Dkt. No. 156), Plaintiffs' Combined Response in Opposition to Defendants' Cross-Motion for Summary Judgment and Opposition to Defendant-Intervenors' Cross Motion for Summary Judgment filed January 19, 2018 ( Dkt. No. 157), Federal Defendants' Reply in Support of Their Motion for Summary Judgment Against Plaintiff-Intervenors filed February 16, 2018 (Dkt. No. 158), Federal Defendants' Opposed Motion to Strike Four Exhibits Attached to Plaintiffs' Reply Brief filed February 16, 2018 (Dkt. No. 159), Federal Defendants' Reply In Support of Their Motion for Summary Judgment Against Plaintiffs filed February 2, 2018 (Dkt. No. 160), Defendant-Intervenors' Reply in Support of Their Cross-Motion for Summary Judgment and in Opposition to Plaintiff-Intervenors' Motion for Summary Judgment filed February 16, 2018 (Dkt. Nos. 161 & 162), Plaintiffs' Opposition to Federal Defendants' Motion to Strike filed February 23, 2018

(Dkt. No. 163), Federal Defendants' Reply in Support of Their Opposed Motion to Strike Four Exhibits Attached to Plaintiffs' Reply Brief filed February 27, 2018 (Dkt. No. 165), Plaintiff-Intervenors' Notice of Supplemental Authority filed December 3, 2018 (Dkt. No. 172), Response to Plaintiff-Intervenors' Notice of Supplemental Authority filed December 10, 2018 (Dkt. No. 173), and Defendant-Intervenors' Response to Plaintiff-Intervenors' Notice of Supplemental Authority filed December 10, 2018 (Dkt. No. 174). On March 2, 2018, the court conducted a hearing on the motions at which all parties were represented by counsel. Having reviewed and considered the motions, responsive and supplemental filings, arguments of counsel, and applicable law, the court renders the following order.

## I.    BACKGROUND

The bone cave harvestman ("harvestman") is a tiny, pale, orange, eyeless, almost invisible, spider-like species that spends its entire life underground. It derives its nutrition from bugs, moisture, and other nutrients that filter down from the surface. It is an elusive spider known to inhabit only Travis and Williamson Counties, Texas and does not often reveal itself to even the most skilled observer. Because of the harvestman's limited population and fragile nature, the United States Fish and Wildlife Service ("the Service") listed the species as endangered in 1993. This case arises out of Plaintiffs ("the Stewards")[1] and Plaintiff-Intervenors' ("Yearwood") request to remove the harvestman from the endangered-species list.

---

[1]    When a case presents competing claims of varying parties, it is often hard to keep the claims of an individual party in focus. And using the legal designation of the parties is often hard for the reader to follow. Here, certain of the parties may be grouped with regard to issues where their interests do not diverge. For simplicity, the court will refer to the parties as follows, unless otherwise noted or needed for context: Plaintiffs American Stewards of Liberty, Charles Shell, Cheryl Shell, Walter Sidney Shell Management Trust, Kathryn Heidemann, Robert V. Harrison, Sr., John Yearwood, and Williamson County, Texas will be collectively referred to as "the Stewards." Plaintiff-Intervenors John Yearwood and Williamson County, Texas will be collectively referred to as "Yearwood." Defendant-Intervenors Center for Biological Diversity, Defenders of Wildlife, and Travis Audubon will be collectively referred to as "the Center."

3

## A. THE ENDANGERED SPECIES ACT

Congress enacted the Endangered Species Act in 1973 (the "Act") to "provide a means whereby the ecosystems upon which endangered species . . . depend may be conserved" and to "provide a program for the conservation of . . . endangered species." 16 U.S.C. § 1531(b). A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." *Id.* at § 1532(6). The Service is responsible for determining whether to list a species as endangered. *Id.* at § 1533(a)(1). It is also responsible for determining whether to delist a species. *Id.* at § 1533(a)(2)(B).

"[I]nterested person[s]" may petition the Service to change the status of a species, including petitioning the Service to remove a species from the endangered-species list. *Id.* at § 1533(b)(3)(A). Within 90 days of the filing of a petition, the Service must make a finding ("90-day finding") as to whether the petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.* Though "substantial scientific and commercial information" may seem like a high bar, *id.*, the Service's regulations indicate otherwise, defining substantial information as only "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. § 424.14(b)(1) (2014).

The Service must evaluate a petition for a "detailed narrative justification" for the requested delisting and a description of the "numbers and distribution of the species involved," "any threats faced by the species," and whether the petition "[p]rovides information regarding the status of the species over all or a significant portion of its range." *Id.* at § 424.14(b)(2)

---

As the interests of Plaintiffs, American Stewards of Liberty, Charles Shell, Cheryl Shell, Walter Sidney Shell Management Trust, Kathryn Heidemann, Robert V. Harrison, Sr., John Yearwood, and Williamson County, Texas, do not diverge, the court will refer to Plaintiffs collectively as "the Stewards," unless otherwise noted or as needed for context.

(2014). The petition need only be "based on available information." *Id.* The Service must

publish its findings in a "listing determination" based on a consideration of five factors:

> (A) the present or threatened destruction, modification, or curtailment of [the species']
>    habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting [the species'] continued existence.

16 U.S.C. § 1533(a)(1); *see also* 50 C.F.R. § 424.11(c), (d) (2014). Listing determinations must

be made "solely on the basis of the best scientific and commercial data available." 16 U.S.C. §

1533(b)(1)(A).

     If the Service determines that delisting *may* be warranted, it will undertake a second

more searching 12-month review of the status of the species to determine whether delisting

action "*is*" or "*is not* warranted." 16 U.S.C. § 1553(b)(3)(B) (emphases added). Under the

implementing regulations, delisting is warranted where:

> the best scientific and commercial data available...substantiate that the
> species is neither endangered nor threatened for one or more of the following
> reasons:
>    (1) Extinction . . .
>    (2) Recovery . . . A species may be delisted on the basis of recovery only
> if the best scientific and commercial data available indicate that it is no longer
> endangered or threatened.
>    (3) Original data for classification in error. Subsequent investigations may
> show that the best scientific or commercial data available when the species was
> listed, or the interpretation of such data, were in error.

50 C.F.R. § 424.11(d)(1)-(3) (2014). If the Service determines that a petition presents substantial

scientific or commercial information indicating that listing or delisting may be warranted, the

Service is required to make a finding within 12 months that (1) the petitioned action is not

warranted; (2) the petitioned action is warranted; or (3) the petitioned action is warranted but

precluded by other higher-priority actions. 16 U.S.C. § 1533(b)(3)(B).

## B. THE HARVESTMAN'S EARLY LISTING HISTORY

In 1988, the Service determined that five species of karst invertebrate should be protected by the Act, including the bee creek cave harvestman. 53 Fed. Reg. 36,029-01 (Sept. 16, 1988). At that time, the bee creek cave harvestman was known to exist only in five or six caves in Travis and Williamson Counties. The Service found in its 1988 listing that the gravest threat to these karst invertebrates was habitat destruction and modification due to urbanization. The Service posited that residential, commercial, and industrial development affected the entire known range of the species. Potential threats to the species from development activities included cave collapse or filling; alteration of drainage patterns; alteration of surface plant and animal communities; contamination of the habitat, including groundwater, from nearby agricultural disturbance, pesticides, fertilizers, and other runoff; and increased human visitation and vandalism. The Service also found that the species was threatened because no laws protected the species or their habitats.

It was not until 1993 that the Service determined that bee creek cave harvestman is actually two species, the bee creek harvestman and the bone cave harvestman. The Service formally extended the 1988 listing to include the bone cave harvestman in 1993. 58 Fed. Reg. 43,818-01 (Aug. 18, 1993). At that time, the Service found that both species continued to face the same threats identified in the original 1988 listing determination, including imperiled habitats due to urbanization. 58 Fed. Reg. at 43,819. In 1993, the Service received and denied the first petition to delist the harvestman. So began a 25-year process to delist the harvestman as more locations of the spider were discovered.

In 1994, the Service completed a Karst Invertebrate Recovery Plan for Travis and Williamson Counties, which included recovery criteria for the harvestman. The Service

examined the threats facing the species, including threats posed by urbanization to the harvestman's habitat. At that time, the Service noted the harvestman's potential for complete recovery and delisting of the species was uncertain. The plan identifies steps and benchmarks that must be met before the harvestman can be reclassified from endangered to threatened.[2]

In 2009, the Service completed a five-year species-status review, as required by the Act. 16 U.S.C. § 1533(c)(2)(A). The purpose of such review is to determine whether a species' status has changed since it was last evaluated, including whether it should be delisted. *Id.*; 50 C.F.R. § 424.21 (2014). The Service determined that no change in listing status was warranted at that time.

## C. 2014 PETITION AND 2017 FINDING

A petition to delist a species must provide available information about past and present population figures and distribution of an endangered species, threats faced by the species, and information about the status of the species over a significant portion of its range. 50 C.F.R. § 424.14(b)(2) (2014). In 2014, the Stewards petitioned the Service to remove the harvestman from the endangered-species list. The petition presented evidence about the harvestman that corresponded to each of the statutory factors and contended that delisting was warranted for three primary reasons. First, the petition asserted that there were significant increases in the overall size of the harvestman's range and known of number of habitats. Second, new data indicates that

---

[2] The plan requires establishing "karst-fauna regions" and "karst-fauna-area preserves" with the following specifications: (1) distinct areas known to support one or more locations of a listed karst species; (2) that possess geologic and hydrologic features that create barriers to the movement of water, contaminants, and troglobitic fauna; and (3) that exist far enough apart from each other that, if a catastrophic event occurs in one area preserve, it would not destroy any other area preserve occupied by the species. Under the recovery plan, reclassification would be possible if three karst-fauna-area preserves within each karst fauna-region in a species' range are protected in perpetuity. If fewer than three karst-fauna-area preserves exist within a given karst-fauna region, then all karst-fauna-area preserves within that region should be protected. Before the Service will reclassify a species, the necessary protections must be in place for at least five consecutive years, with assurances that the area preserves will remain protected in perpetuity.

the existence and magnitude of threats identified in the 1988 listing do not support the conclusion that the species is at risk of extinction now or in the foreseeable future. Third, significant local and state conservation efforts and laws have helped to achieve recovery of the harvestman.

The Service issued a 90-day finding, concluding that delisting was not warranted. 80 Fed. Reg. 30,990 (June 1, 2015). On December 15, 2015, the Stewards filed this suit challenging the 2015 90-day finding. While the case was pending, the Service sought to voluntarily remand the case back to the Service to address an inadvertent clerical error in its decision, namely, in failing to examine certain reference materials in making its decision. This court granted the remand.

In 2017, the Service rendered a second 90-day finding, concluding that delisting was not warranted based on the evidence presented in the original 2014 petition. 82 Fed. Reg. 20,861-02 (May 4, 2017).[3] The 2017 finding supersedes the 2015 finding. 82 Fed. Reg. at 20,863. The parties now contest the 2017 finding. The evidence presented in the 2014 petition and the Service's response in the 2017 finding is summarized below

> *Factor 1: Present or threatened destruction, modification, or curtailment of the harvestman's habitat or range*

The primary threat to the harvestman identified in 1988 was the potential loss of habitat because of threats posed by urbanization and development. Much of the evidence in the petition is intended to disprove this threat.

---

[3]     The delisting determination consists of several parts: (1) the Service-published summary notice of its finding; (2) a more detailed, signed notice of the same finding; and (3) the Petition Review Form for Delisting a Listed Entity. For the purpose of this order, the court will refer to the summary notice, detailed signed notice, and petition review form collectively as the "2017 finding."

The Stewards presents evidence of an increase in known locations of the harvestman from five or six at the time of the 1988 listing to 172 in 2014. This amounts to an increase at a rate of 7.59 new sites discovered per year and a total population increase of 3,340 percent. The Stewards also presents evidence of five caves that currently support the harvestman despite being located near developing areas, humans, and tourist attractions, which were all identified as threats to the survival of the species in 1988.

- Inner Space Caverns: This cave is located under a highway and train track, receives about 100,000 visitors per year, and includes paved walkways and electrical lighting. Surveys done on the cave show a continued presence of the harvestman despite heavy human traffic.

- Sun City Caves: These caves are located near a residential subdivision and regularly monitored. One survey found an increase in fauna, and most surveys indicate that there has not been a substantial negative change in the population. Biologists continue to observe the harvestman during their surveys of the property.

- Weldon Cave: The Service identified this cave in the 1988 listing as a concern because of a nearby road extension and residential development. In 1988, this cave was the only example given by the Service of the potentially adverse effects of development on the harvestman. The cave has since been identified by the Service as a sustainable habitat for the species.

- Three-Mile and Four-Mile Caves: The petition lists these caves as places where the harvestman persists despite being located underneath a highway. The interior of the walls are covered in historic graffiti, which indicates a steady stream of vandalism and human traffic throughout the years.

The petition urges that, without affirmative evidence that development activities will lead to a significant reduction in the population size, the caves provide compelling evidence that the harvestman has continued to persist alongside development, contrary to the Service's conclusion at the time of listing.

The petition also presents some evidence documenting the use of "mesocaverns" by the harvestman—a phenomenon that was not considered in the 1988 listing—as a potential habitat for the species. A mesocavern is a humanly impassable void that may or may not be connected

9

to larger cave passages. The discovery of mesocaverns as a habitat location is significant, the petition explains, because mesocaverns are geologically protected from development and other activities occurring on the surface that threaten the harvestman's habitat. The petition states that it is likely that there are at least 125 square miles of habitable mesocaverns.

In sum, the petition argues that current available evidence demonstrates that the harvestman coexists with development and human traffic. The petition points out that no negative correlations have been found between development and a decline in the harvestman population. Since impacts of development are likely not as significant to the species as predicted by the Service in the 1988 listing, the petition argues that the harvestman should be delisted.

The Service begins its discussion of *Factor 1* by restating that the primary threat to the harvestman is still the potential loss of its habitat due to development activities. The Service recognizes the five caves discussed in the petition. Nonetheless, the Service states that the observation of the harvestman in these locations is not proof that they are thriving or can withstand the long-term impacts of development activities. The Service acknowledges that it lacks adequate data to conduct a species-trend analysis, given that it may take decades to detect the harvestman's population trend because of small sample sizes, difficulty surveying the species, and its long life span. Nonetheless, the finding states that the petition does not provide the Service with adequate information to detect population trends. After concluding that there is not enough data to do a trend analysis, the Service addresses each of the caves presented in the petition.

- Inner City Space Caverns: The Service states that although the harvestman may be present at the caverns, their presence is not proof that the harvestman's population is robust and secure. The Service points out that, despite the harvestman's presence, the population may still be declining and at risk from threats arising from development. The Service also observes that the cavern has an overgrowth of algae that may out-compete the harvestman for food. The

Service further states that the petition failed to provide enough data for the Service to assess trends in the harvestman in relation to the time that they have been exposed to artificial lighting in the cavern. The Service further observes that part of the cavern is located under a highway and train tracks, which both present a threat of contaminant spill that could impact the species in the future.

- Sun City Cave: The Service states that the petition failed to provide enough data for the Service to assess the cumulative effect of the development on the harvestman's population trend.

- Weldon, Three-Mile, and Four-Mile Caves: The Service points out that the Weldon cave is surrounded by undeveloped space, not developed space, as the petition asserts. The Service further states that detailed survey data was not provided by the petitioners for three or four-mile caves.

- Mesocaverns: The Service states that it is unclear why the Stewards believes that mesocaverns are geologically protected from surface activities. It points to a study that mesocaverns are subject to rapid permeation of surface water. As a result, the harvestman would be as susceptible to groundwater contamination because water penetrates rapidly through the rock in mesocaverns.

The finding additionally discusses a study conducted in 2007 that compares caves in urbanized areas with caves in natural areas to bolster the finding's conclusion about the effect of urbanization on the harvestman. The study found that, even though a small area within a largely urbanized ecosystem may support a cave community with karst invertebrates, karst populations are significantly lower than those found in caves in more natural, less-developed ecosystems. The study suggests that this is most likely a result of reduced nutrient input. The finding does not note whether the harvestman was specifically considered in the study. The finding also points to a study conducted at Lakeline Cave in Travis County, that documents a significant decline in another karst-invertebrate species over a 20-year time frame. During this same time frame, no more than three examples of the harvestman were observed in any one survey, and the harvestman was not seen at all over six years and 12 surveys. The finding concludes that urbanization and human population growth and development continue to represent a threat to the species, especially in light of the exploding population in the Austin area.

*Factor 2: Disease or predation*

In the 1988 finding, fire ants were identified by one study as being a potential competitor with the harvestman. The study predicted that threats posed by fire ants would be exacerbated as the human population increased. The petition presents evidence that fire ants have not been shown to have a lasting negative impact on the harvestman populations nor on the ability of the harvestman to persist in areas that contain fire ants. Specifically, the petition includes a discussion of studies conducted since the 1988 listing, which suggest that the impact to the harvestman by fire ants is greatest during and shortly after an initial fire-ant invasion, and long-term impacts are likely not as significant as once believed. The petition asserts this represents new scientific information that refutes previous conclusions drawn by the Service about the susceptibility of the harvestman to fire-ant infestations. The petition also presents evidence of specific locations in Texas where there was not a decline in the harvestman despite the presence of fire ants.

The Service recognizes the study, but notes that the study also states that red fire ants likely did contribute directly or indirectly to the disappearance or reduction in numbers of the harvestman and that the study should not be interpreted as an indication that detrimental effects of invasive ants will simply disappear with time. The Service states that fire ants have been observed within and near many caves in central Texas. The Service finally notes that it previously considered the study cited by the petition.

*Factor 3: Inadequacy of existing regulatory mechanisms*

In 1988, there were no laws in place to protect the harvestman or its habitats. The petition identifies 94 caves that are now protected from development by state and local regulations. The petition also details extensive state, county, and city regulations that represent

significant conservation efforts, including regulations by the City of Austin, City of Georgetown, and the Texas Commission on Environmental Quality.

The Service recognizes the new regulations but nonetheless concludes that there is not enough information in the petition to indicate whether or not the state and local regulations provide enough protection against all threats faced by the harvestman. For example, the Service states that the City of Austin ordinances do not meet karst-preserve design criteria[4], do not protect crickets (a food source for the harvestman), do not include surface and subsurface drainage basins, and do not protect the entire range of the harvestman's habitat. As for the City of Georgetown Water Quality Management Plan, the Service points out that, because the purpose of the plan is designed to protect salamanders, the plan offers only limited benefit to the harvestman. The Service also observes that participation in the Georgetown Plan is voluntary and that the petition does not provide enough detail to evaluate all the benefits the plan would provide to the harvestman. As for the Texas Commission on Environmental Quality rules, the Service explains that it previously concluded that the rules have limited benefit because they do not regulate all caves inhabited by the harvestman.

*Factor 4: Other natural or manmade factors affecting continued existence*

Though not originally identified in 1988, the Service has since identified climate change as a potential threat to the harvestman. The Service acknowledges a lack of evidence showing a direct correlation between climate change and impact on the harvestman. The petition argues that studies indicate that the harvestman habitats in smaller and deeper mesocaverns may mitigate the potential threat of climate change.

The Service addresses the likelihood that climate change will affect the harvestman, and specifically, the petition's contention that the use of mesocaverns may mitigate the threat of

---

[4] *See supra* note 2.

climate change. The Service acknowledges that mesocaverns may provide protection from climate change, but states that mesocaverns will likely not be enough to ameliorate the effect of climate change on the harvestman. The Service identifies specific dangers from climate change including increased storms, higher temperatures, and modifying habitat or nutrient availability.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the context of a challenge to an agency action under the Administrative Procedure Act ("APA"), "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review." *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008). Thus, in evaluating a case on summary judgment, the court applies the standard of review from the APA. *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001); *see also Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998).

Under the APA, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. A 90-day finding that delisting is not warranted is subject to judicial review under the Act. *See* 16 U.S.C. § 1533(b)(3)(C)(ii) ("Any negative finding described in subparagraph (A) and any finding described in subparagraph (B)(i) or (iii) shall be subject to judicial review."). In a challenge to agency action brought pursuant to the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

When reviewing for arbitrariness and capriciousness, a court considers whether an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Agency action is arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* The scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Id.* Nor should the court "reweigh the evidence." *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Instead, this court looks to "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). Even though arbitrary-and-capricious review is narrow, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Id.*

In addition to a prohibition on arbitrary or capricious action, the APA prohibits agency action that is "not in accordance with law," 5 U.S.C. § 706(2)(A), or is carried out without following procedures prescribed by statute. *See id.* at § 706(2)(D); *see also FCC v. NextWave Personal Communications Inc.*, 537 U.S. 293, 300 (2003) ("The Administrative Procedure Act requires federal courts to set aside federal agency action that is "not in accordance with law," 5

U.S.C. § 706(2)(A)—which means, of course, any law, and not merely those laws that the agency itself is charged with administering."). The court recognizes that Section 706(2)(A) has four standards within it and considers in this opinion whether the Service's 90-day finding is "arbitrary, capricious, . . . or otherwise not in accordance with law." *Id.* at 706(2)(A).[5]

## A. ARGUMENTS OF THE PARTIES

The Stewards moves for summary judgment on the basis that the Service's finding is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A). More specifically, the Stewards argues that: (1) the Service applied an unlawful and overly burdensome standard of review in making its finding; (2) the Service unlawfully judged the petition based on whether it proved that criteria from the 1994 Recovery Plan had been met; (3) the Service failed to consider claims in the petition that the harvestman was listed in error, as required by its own regulations; and (4) the Service misapplied its regulations in making its finding.

The Service separately moves for summary judgment, arguing that its finding is not arbitrary and capricious.[6] More specifically, the Service asserts that it applied the correct standard and considered all appropriate information when it reviewed the petition. It also contends that the Stewards has not met its burden in showing that the Service's denial of the petition is so implausible that it could not be ascribed to a difference in view or the product of

---

[5] The court's analysis would not change were it to analyze the 90-day finding under Section 706(2)(D).

[6] The Stewards, the Service, and the Center for Biological Diversity ("the Center") each move for summary judgment under the APA. The motions address whether the Service's finding is arbitrary, capricious, or otherwise not in accordance with law. The Service and the Center's motions for summary judgment will be considered together, as they make substantially the same argument. Yearwood, the Service, and the Center additionally move for summary judgment based on the constitutionality of the Act. *See infra* Section IV.

agency expertise. To that end, the Service argues it rationally determined that the petition failed to present substantial scientific or commercial information.

The Center also moves for summary judgment, arguing that the Stewards has not met its burden in presenting substantial scientific information to indicate that delisting of the species may be warranted. The Center additionally argues that any doubts regarding the threats facing the harvestman must be construed in its favor.

### III.   ANALYSIS

The Stewards presents several arguments as to why summary judgment should be granted in its favor, but its most persuasive argument is that the Service required a higher quantum of evidence than is permissible under the Act and implementing regulations governing a 90-day finding.

Upon review of the petition and the 2017 finding, and for the reasons that follow, the court concludes that the Service violated its regulations when it required the Stewards to essentially present conclusive evidence about the harvestman's population trends—more evidence than the Service admits is available or attainable. The Service's regulations require a petition to present only "available information," and the Service committed a clear error in judgment and acted arbitrarily, capriciously, and not in accordance with law when it called for more evidence than the law requires. The court will vacate the 2017 finding and remand the finding to the Service for further consideration of the Stewards' petition based on available population information, not population information that the Service admits is impossible to attain.

**A. The Service violated its regulations governing the standard for reviewing a delisting petition by requiring an unlawfully high quantum of evidence.**

In a challenge to agency action under the APA, part of the court's task involves "reviewing agency action to determine whether the agency conformed with controlling statutes." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983). Agency action that disregards applicable law is arbitrary and capricious, and must be set aside. *See, e.g., Caring Hearts Pers. Home Servs., Inc. v. Burwell*, 824 F.3d 968, 970–71 (10th Cir. 2016); *Friends of Richards-Gebaur Airport v. F.A.A.*, 251 F.3d 1178, 1195 (8th Cir. 2001) ("[A]n agency implementing a statute may not ignore . . . a standard articulated in the statute."). Agency regulations are an extension of the legislative process and bind the agency with the force and effect of law. As with statutes, an agency must comply with its own regulations, and the court must review an agency's actions to ensure conformity with relevant regulations. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–68 (1954) (standing for proposition that agencies must comply with their regulations); *see also Erie Boulevard Hydropower, LP v. Fed. Energy Regulatory Comm'n*, 878 F.3d 258, 269 (D.C. Cir. 2017) ("It is axiomatic . . . that an agency is bound by its own regulations."); *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841, 852 (9th Cir. 2003) (upholding challenge under Section 706 of the APA and finding that "[h]aving chosen to promulgate the [] policy, the [Service] must follow that policy"); *Alamo Exp., Inc. v. United States*, 613 F.2d 96, 97–98 (5th Cir. 1980) (per curiam) (finding Interstate Commerce Commission violated APA because it failed to comply with internal procedures).

Under the Act, a petition must "present[] substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). The Service's regulations in turn, define substantial information as "that amount of information that

would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. § 424.14(b)(1) (2014). The regulations further provide that a petition must "[c]ontain detailed narrative justification for the recommended measure, describing, *based on available information*, past and present numbers and distribution of the species involved and any threats faced by the species." *Id.* at § 424.14(b)(2) (2014) (emphasis added). The Service must make each listing determination "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A).

The petition presents extensive evidence that the gravest threat to the harvestman identified in the 1988 listing—loss of habitat due to development—might not be as grave as was predicted in 1988, and that reconsideration of the listing determination may be warranted. To support this contention, the petition includes evidence that the population of the harvestman has steadily increased since the time of the listing—from five in 1988 to 172 as of 2014—despite an explosion in the human population. It also offers examples of five different caves in which the harvestman co-exist with human visitors, highway disruptions, tourist attractions, and industrial development, all of which the 1988 finding predicted would endanger or eradicate the species. It presents evidence that the fire ant, identified by some studies as a competitor with the harvestman, may not threaten the harvestman's food source to the extent believed by the Service in 1988. Finally, it presents evidence of overlapping regulatory regimes that now provide protection for the harvestman, as compared to no regulatory protections in 1988.

In considering the Stewards' petition, the Service correctly articulates the standard required by its regulations, "[w]e evaluated this petition under the 50 CFR 424.14 requirements that were in effect prior to October 27, 2016, as those requirements applied when the petition and supplemental information were received." The Service analyzed the five "listing factors," as the

Act requires. The Service determined that the evidence presented in the petition is not enough for the Service to conclude that delisting may be warranted. The Service came to this decision after conducting an overall assessment of the viability of the harvestman and threats to its continued existence. However, the finding recognizes that there is currently no available data on the overall population trend of the harvestman. The finding also recognizes that, although population-trend information is likely impossible to attain, it is nonetheless essential to proving that the harvestman's population is not declining or threatened because of urbanization. For example, the finding stated that "[i]t may be infeasible to assess karst invertebrate population trends in any statistically significant manner given their association with humanly inaccessible cave habitat such as mesocaverns." Indeed, the harvestman is so elusive that the Service requires 14 different surveys of a cave to determine to its satisfaction whether the harvestman is present. And yet, when presented with actually available evidence that the harvestman exists and continues to populate near developing areas, the Service discounts this evidence, stating at least four times that the petition "failed to provide data adequate to assess trends." The Service stated that the harvestman "may be declining or threatened even though they are observed at a . . . site. The petition did not provide adequate information to detect population trends . . . and it is not available from other sources . . . . [w]e indicated in the [1994 90-day [f]inding] that more time was needed to detect if the species is declining; however . . . we are still lacking adequate data to conduct a trend analysis." The Service also makes that "the petition failed to provide data adequate to assess trends in the karst invertebrate populations since the development occurred," and also that "the petition failed to provide any data adequate to assess trends in the karst invertebrate population in relation to the time (duration and frequency) that [the harvestman has] been exposed to the artificial lighting." As for climate change, the Service states that "the

petition provided no trend analysis to indicate that this species can withstand the threats associated with development or climate change over the long term." This lack of conclusive population data led the Service to conclude that the petition did not present enough information to demonstrate that delisting may be warranted.

By requiring evidence that the Service admits is either infeasible to collect or totally unavailable, the Service makes it all but impossible for the Stewards to disprove the essential assumption of the 1988 listing—that the harvestman would decline as the population increases because of dangers to its habitat—and thus, makes the case for delisting the harvestman impossible. Rather than considering whether the information presented in the petition may indicate that delisting is warranted, the Service requires conclusive evidence that the overall population of the harvestman did not decline as human population and development increased. The Service disputes this point and argues that the petition was not denied because of a lack of population-trend data, but that the Service denied the petition after the Service conducted an overall assessment of the viability of the harvestman and threats to the harvestman's continued existence. Nonetheless, after review of the finding, this court concludes that the bulk of the evidence presented in the petition was discounted because it was not accompanied by overall-population-trend data.

The court concludes that denying the petition because the petition lacks admittedly *unavailable* evidence, the Service did not make its decision based on the best *available* data, in violation of the Act and implementing regulations. *See* 16 U.S.C. § 1533(b)(1)(A) ("Listing determinations" must be made "solely on the basis of the best scientific and commercial data available"); 50 C.F.R. § 424.14(b)(2) (2014) (petition must describe "based on available information, past and present numbers and distribution of the species involved and any threats

faced by the species"). In reaching this conclusion, the court recognizes that the evidence presented in the petition is not conclusive proof that the species is actually increasing or that an increase in human population will not detrimentally affect the harvestman's habitat. The court concludes only that that the evidence presented in the petition meets the low evidentiary threshold set forth in the Act and implementing regulations for a 90-day finding—that delisting of the harvestman *may* be warranted. The Service may determine after a more searching inquiry whether the harvestman is, in fact, increasing, and whether delisting of the species definitively is or is not warranted. *See* 16 U.S.C. § 1533(b)(3)(B).

**B. The Service's violation of the Act and implementing regulations is arbitrary, capricious, and not in accordance with law.**

Under the APA, a court must set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43. When reviewing for arbitrariness or capriciousness, this court looks to "whether [an agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Judulang*, 565 U.S. at 53. Even though arbitrary and capricious review is narrow, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Id.* In determining whether the Service has engaged in "reasoned decisionmaking" this court considers what is required of the agency by the Act and implementing regulations, which provide the evidentiary lens through which the agency is to "examine relevant data." *State Farm*, 463 U.S. at 43.

Many courts have concluded that an agency's failure to comply with its own regulations is arbitrary and capricious. *See, e.g., Erie Boulevard Hydropower*, 878 F.3d at 269 ("[I]f an

agency action fails to comply with its regulations, that action may be set aside as arbitrary and capricious."); *Nat'l Envtl. Dev. Assoc.'s Clean Air Project v. E.P.A.*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (holding that an "agency is not free to ignore or violate its regulations" and "an agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations'"). Other courts have concluded that an agency's failure to comply with its own regulations is "not in accordance with law." *See, e.g., Calderon v. Sessions*, 330 F. Supp. 3d 944 (S.D.N.Y. Aug. 1, 2018) (citing 5 U.S.C. § 706(2)(A)); *Koshman v. Vilsack*, 865 F. Supp. 2d 1083, 1095 (E.D. Cal. 2012) (challenge that agency did not abide by its own regulations and governing statutes and concluding that agency's decision is "not in accordance with the law").

The court finds that the Service did not engage in "reasoned decisionmaking" when it did not follow the standard set by Congress and implementing regulations intended to guide the Service's decisionmaking. The court concludes that the petition presents available, substantial scientific and commercial information indicating that delisting of the harvestman may be warranted. As a result, the court concludes that the Service's conclusion to the contrary is arbitrary, capricious, "or otherwise not in accordance with [the Act and implementing regulations]," which require that a petition need only present available evidence. 5 U.S.C. § 706(2)(A).[7] The court will vacate the 2017 finding and remand the finding to the Service for further consideration of the Stewards' petition based on available population information, not population information that the Service admits is impossible to attain. *See Chamber of Commerce of United States of Am. v. United States Dep't of Labor*, 885 F.3d 360, 388 (5th Cir.

---

[7] The Stewards additionally contends that the 2017 finding is arbitrary and capricious because the Service unlawfully relies on the recovery plan and karst-preserve design recommendations as necessary evidence of whether the harvestman has recovered and necessitates delisting. Because the court concludes that the finding is arbitrary and capricious on other grounds, the court need not consider the argument that the use of the recovery plan as binding is unlawful.

2018), *judgment entered sub nom. Chamber of Commerce of Am. v. United States Dep't of Labor*, No. 17-10238, 2018 WL 3301737 (5th Cir. June 21, 2018) (vacating rule found to be arbitrary, capricious, and not in accordance with law); *see also N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008) ("[W]hen a court reviewing agency action determines that an agency made an error of law . . . the case must be remanded to the agency for further action consistent with the corrected legal standards.").

## C. The Service considered whether the harvestman was listed in error.

Delisting is also appropriate under the Service's regulations if "[s]ubsequent investigations may show that the best scientific or commercial data available when the species was listed, or the interpretation of such data, were in error." 50 C.F.R. § 424.11(d)(3) (2014).

The 1988 listing identifies the primary threat to the harvestman as potential loss of habitat because of ongoing development activities. The Stewards' petition states that the discovery of many previously unknown populations of the harvestman arguably demonstrates that the 1988 listing was in error because more species have been discovered as development increases. The Stewards argues that the record is devoid of any evidence that the Service evaluated whether the original listing was in error. This argument is not supported by the record.

The finding expressly considers whether the original listing was erroneous. The finding states that a review of the petition does not indicate that the original classification was made in error. The Service concludes "[b]ased on our review and evaluation . . . the petition does not present substantial scientific or commercial information indicating that the delisting of the harvestman may be warranted due to . . . error in the original scientific data at the time the species was classified or in our interpretation of that data." For example the Service indicates that "species may be delisted when subsequent investigations 'show that the best scientific and commercial data available when the species was listed, or the interpretation of such data, were in

error.'" The Service also considered the petition's assertion "that threats to the species are not as severe as originally thought . . . [w]e evaluate that information, below, with respect to the five listing factors." In light of the record, the court concludes that the Service did consider whether the original listing was in error.

The Stewards also disagrees with the substance of the Service's determination that the original listing was not in error. Very little was known about the harvestman at the time of the 1988 listing. The 1988 listing is based on a handful of studies on similar species, their food sources, and the potential effects of human development on the species. At the time of listing, neither the Service nor scientists were aware that the harvestman was a distinct species, and the listing is not specific to the harvestman. Nonetheless, the primary threat identified is the potential loss of habitat due to ongoing human development. The petition posits that the discovery of previously unknown populations of the harvestman arguably demonstrates that the 1988 listing was in error. The court is not persuaded. The regulations governing whether a listing was in error are backward looking, and the court looks to whether subsequent information reveals that "data available when the species was listed . . . were in error" at the time of listing. 50 C.F.R. § 424.11(d)(3) (2014). The discovery of previously unknown populations of the harvestman does not demonstrate that the data on which the original listing is based was erroneous at the time of the 1988 listing. Limited information available about the species at the time indicated that the habitats of the harvestman would be threatened by changes arising from human population increases and development. Information now available indicates that threat may not be as grave as initially predicted and that delisting may be warranted. The Service will consider this on remand. The court rejects the Stewards argument of error in the 1988 listing.

## IV.    PLAINTIFF-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

Yearwood moves separately for summary judgment under the APA, arguing that Congress has exceeded its constitutional authority under the Commerce Clause, the Necessary and Proper Clause, and Tenth Amendment by regulating the "take" of the harvestman. *See* U.S. Const. art. I, § 8, cl. 3; U.S. Const. art. I, § 8, cl. 18; U.S. Const. Amend. X; *see also* 16 U.S.C. § 1538(a)(1)(B) (prohibiting the "take" of certain endangered species).[8]    Yearwood is supported by the State of Texas and Mountain States Legal Foundation, both of whom submitted *amicus curiae* briefs in support of Yearwood's motion for summary judgment.

The Service and the Center cross-move for summary judgment, arguing that Yearwood's claims are barred by the applicable statute of limitations.[9]    In the alternative, the Service argues that Yearwood's constitutional arguments is foreclosed in this circuit because regulating takes of the harvestman under the Act is a valid exercise of the Commerce Clause power.    *See GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622 (5th Cir. 2003), *reh'g denied*, 362 F.3d 286 (5th Cir. 2004).    The Service also contends that the Congress's regulation of takes is consistent with the Necessary and Proper Clause and the Tenth Amendment.    *See* U.S. Const. art. I, § 8, cl. 18; U.S. Const. Amend. X.

---

[8]    A "take" is defined as harassing, harming, pursuing, hunting, shooting, wounding, killing, trapping, capturing, collecting, or attempting to engage in any such conduct. *Id.* at § 1532(19).  Property owners and developers must seek permits from the Service for approval of any activities that might disturb an endangered species. *Id.* at § 1539(a).  The consequences of an unauthorized take can be serious, including civil and criminal penalties, fines as great as $50,000, and imprisonment for up to one year. *Id.* at § 1540.

[9]    The arguments of the Service and the Center are substantively similar, and the court will refer to the arguments made by both as the Service's arguments, unless otherwise noted or as needed for context.

**A. Yearwood's claims are not barred by the statute of limitations, but Williamson County's claims are barred.**

Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law [or] contrary to a constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)-(B). Because the APA lacks a specific statutory limitations period, challenges brought under the APA are "governed by the general statute of limitations provision of 28 U.S.C. § 2401(a), which provides that every civil action against the United States is barred unless brought within six years of accrual." *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1286 (5th Cir. 1997); *see also* 28 U.S.C. § 2401(a) ("[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.").

In determining when a right of action accrues, the law distinguishes between a "facial challenge" to a regulation and a challenge to a regulation after an agency applies that regulation to a plaintiff. *See Dunn*, 112 F.3d at 1287. "On a facial challenge to a regulation, the limitations period begins to run when the agency publishes the regulation." *Id.* The *Dunn* court, declined to rule on the merits of a plaintiff's facial claim "that the regulations exceeded National Park Service authority under the Padre Island National Seashore Act" because the plaintiff "failed to mount a facial challenge to the regulations within six years of their publication." *Id.* Nonetheless, the court concluded that the regulation could be challenged "after the limitations period has expired, provided that the ground for the challenge is that the issuing agency exceeded its constitutional or statutory authority." *Id.* To sustain such a claim, an agency must apply the rule to the plaintiff such that the plaintiff can "show some direct, final agency action." *Id.* Final agency action includes a plaintiff petitioning an agency for relief from a regulation. *Id.* (citing

*Wind River Mining Corp. v. United States*, 946 F.2d 710, 715–16 (9th Cir. 1991); *Public Citizen v. Nuclear Regulatory Com'n*, 901 F.2d 147, 152–53 (D.C. Cir. 1990)). It also includes an agency issuing an order requiring a plaintiff to comply with a regulation. *Dunn*, 112 F.3d at 1287 (citing *Texas v. United States*, 730 F.2d 409, 411–12 (5th Cir. 1984)). Thus, "an agency's application of a rule to a party creates a new six-year cause of action to challenge to the agency's constitutional or statutory authority." *Dunn*, 112 F.3d at 1287.

In addition, "agency action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *U.S. Army Corps of Engineers v. Hawkes Co.*, —— U.S. ——, 136 S.Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Agency action marks the consummation of agency decisionmaking if it is not "advisory in nature" but is instead "definitive [in] nature." *Id.* at 1813–14. The action must also be one by which rights or obligations have been determined, or from which legal consequences will flow, and thus, must "give rise to 'direct and appreciable legal consequences.'" *Id.* at 1814 (quoting *Bennett*, 520 U.S. at 178).

The court concludes that Yearwood's challenge is not barred by the limitations because he is a party to the 2014 petition to delist the harvestman and is directly affected by the Service's decision not to delist the harvestman. Yearwood can demonstrate the requisite "direct, final agency action" affecting him personally and may challenge the Service's statutory and constitutional authority for applying the rule. *Dunn*, 112 F.3d at 1287. Accordingly, the court concludes that Yearwood's constitutional challenges are not barred by the statute of limitations.

As Yearwood concedes, however, Williamson County is not a party to the 2014 petition to delist the harvestman. The County nonetheless claims that it has suffered similar injuries to those suffered by Yearwood and other parties who filed the petition and should not be barred by

28

limitations. The County marshals to no legal support for this proposition. Because the County is not a party to the 2014 petition, it cannot show the requisite direct and final action that flows from the denial of Yearwood's petition. The County's claims are barred by limitations.

## B. The Service's regulation of the harvestman takes does not violate the Commerce Clause.

Under the Commerce Clause, Congress may "regulate Commerce . . . among the several States," U.S. Const. art. I, § 8, cl. 3, including regulating activities that "substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558–59 (1995); *United States v. Morrison*, 529 U.S. 598, 609–12 (2000). Additionally, an intrastate activity may be regulated if it is "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, 545 U.S. at 561; *Morrison*, 529 U.S. at 657.

In reviewing an act passed under Congress's Commerce Clause authority, the court applies a rational-basis analysis, under which courts "need not determine whether . . . activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Gonzales v. Raich*, 545 U.S. 1, 22 (2005) (quoting *Lopez*, 514 U.S. at 557); *see also GDF Realty*, 326 F.3d at 627. Yearwood disputes that this court should review the Act under a rational-basis standard. Yearwood's primary argument is that Supreme Court and Fifth Circuit cases altered the landscape for evaluating regulations of non-commercial intrastate activity "from a traditional Commerce Clause analysis," which is scrutinized for a rational basis, to one that is analyzed under the Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18, with a higher level of scrutiny. *See Raich*, 545 U.S. at 34; *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 562–74 (2012); *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013); *United States v. Whaley*, 577 F.3d 254, 260–61 (5th Cir. 2009).

Yearwood asserts that the Necessary and Proper Clause requires that regulations be (1) "narrow in scope," (2) "incidental" to the regulation of commerce, and (3) cannot "work a substantial expansion of federal authority." *Sebelius*, 567 U.S. at 560–61.

    a. *GDF Realty Investments, Ltd. v. Norton*

Regulation of a take of the harvestman is a valid exercise of the Commerce Clause power. *GDF Realty*, 326 F.3d at 622. In *GDF Realty*, a group of developers challenged the harvestman's listing determination, arguing that the Act's take provision as applied to the harvestman was unconstitutional. Like Yearwood, the developers argued that the take provision exceeded Congress's Commerce Clause authority because a take of the harvestman has no relationship to interstate commerce. *Id.* at 626. The court analyzed the Act and the listing provision under the *Lopez* and *Morrison* framework, and concluded that the Act is a general regulatory statute that is economic in nature and has a substantial relation to commerce. *Id.* at 640 (citing *Lopez*, 545 U.S. at 561; *Morrison*, 529 U.S. at 657). Though takes of the harvestman by themselves do not have an effect on interstate commerce, the court concluded that regulating intrastate takes is an essential part of the Act as a whole. *Id.* Thus, the application of the Act to the harvestman "is a constitutional exercise of the Commerce Clause power." *Id.* at 641.

Yearwood recognizes *GDF Realty* but argues that its mode of analysis has been overruled by subsequent cases. *See Raich*, 545 U.S. at 34; *Sebelius*, 567 U.S. at 562–74; *Castille*, 712 F.3d at 215; *Whaley*, 577 F.3d at 260–61. Yearwood contends that the *GDF Realty* court applied a "deferential" version of rational-basis scrutiny to claims under the Commerce Clause in *GDF Realty*. Yearwood asserts that *Raich*, *Sebelius*, and *Whaley* altered the applicable test for evaluating regulations of non-commercial intrastate activity "from a traditional Commerce Clause analysis," analyzed under rational-basis scrutiny, to one that more closely scrutinizes

regulations under the Necessary and Proper Clause. Thus, Yearwood asks this court ignore the holding of *GDF Realty* and look anew at the regulation of the harvestman takes in light of *Raich*, *Sebelius*, and *Whaley*.

        b.   *Gonzalez v. Raich* and *United States v. Whaley*

Yearwood argues that a concurring opinion *Raich* altered the analysis for intrastate activities that have a substantial effect on interstate commerce. *Raich*, 545 U.S. at 34 (Scalia, J., concurring) ("Congress's regulatory authority over intrastate activities that are not themselves part of interstate commerce (including activities that have a substantial effect on interstate commerce)" should "derive[] from the Necessary and Proper Clause."). *Id.* The *majority* in *Raich*, however analyzed the case under *Lopez* and *Morrison* and applied a rational-basis test in reviewing non-commercial intrastate activities that have a substantial effect on interstate commerce. *Id.* at 22. The majority did not separately analyze the case under the Necessary and Proper Clause.

Yearwood additionally contends that the circuit adopted *Raich's* concurring opinion in *United States v. Whaley.* 577 F.3d at 260. *Whaley* involved a challenge to the Sex Offender Registration and Notification Act that the court upheld as a valid regulation of activities under the Commerce Clause. *Id.* at 258. After upholding the statute under the Commerce Clause, the court stated "to the extent that [the statute] applies to sex offenders remaining intrastate, the Necessary and Proper Clause provides Congress with the necessary authority." *Id.* at 260–61 (citing *Raich*, 545 U.S. at 35–37 (Scalia, J., concurring)).

The Fifth Circuit "follows the rule that alternative holdings are binding precedent and not obiter dictum." *Texas v. United States*, 809 F.3d 134, 178 n.158 (5th Cir. 2015) (quoting *United States v. Potts*, 644 F.3d 233, 237 n.3 (5th Cir. 2011)), *aff'd by an equally divided Court*, ——

U.S. ——, 136 S.Ct. 2271 (2016); *see also United States v. Reyes-Contreras*, No. 16-41218, ——

F.3d ——, —— n.19, 2018 WL 6253909, at *7 n.19 (5th Cir. Nov. 30, 2018) (en banc). This court

does not find that *Whaley's* brief, two-paragraph discussion of the Necessary and Proper Clause,

is an "alternative holding" as opposed to additional reasoning. Assuming, *arguendo*, that

*Whaley's* discussion is an alternate holding, the court nonetheless concludes that *Whaley's*

alternative invocation of the Necessary and Proper Clause to analyze instrumentalities and

channels of interstate commerce does not overrule *GDF Realty*. *Whaley* does not mention *GDF*

*Realty*, and as such, does not unequivocally overrule the holding or analysis of *GDF Realty*.

Moreover, the circuit did not reference *Whaley* nor apply a Necessary and Proper Clause analysis

when it most recently upheld the constitutionality of the Act's critical-habitat-designation

provision under the Commerce Clause. *See Markle Interests, L.L.C. v. United States Fish &*

*Wildlife Serv.*, 827 F.3d 452, 459 (5th Cir. 2016), *vacated and remanded sub nom. Weyerhaeuser*

*Co. v. U.S. Fish & Wildlife Serv.*, —— U.S. ——, 139 S. Ct. 361 (2018), and *cert. granted,*

*judgment vacated on other grounds sub nom. Markle Interests, L.L.C. v. U.S. Fish & Wildlife*

*Serv.*, No. 17-74, 139 S. Ct. 50 (Dec. 3, 2018). Instead, the circuit applied the majority's

analysis in *Raich* and discussed the reasoning and holding of *GDF Realty*. *Id.* at 477–78.

This court recognizes that the Supreme Court vacated the judgment in *Markle* in light of

*Weyerhaeuser*, but the Court did so on other grounds.[10] Though *Markle* no longer holds

---

[10] Two separate petitions for a writ of certiorari were filed in *Markle*. The Court granted
the petition of Weyerhaeuser Company, which primarily raised an issue of statutory construction
of the Act's critical-habitat-designation provision. *See Weyerhauser Co. v. U.S. Fish and*
*Wildlife Serv.*, No. 17-71, —— U.S. ——, 138 S. Ct. 924 (Jan. 22, 2018). The petition of Markle
Interests, LLC; P&F Lumber Company 2000, LLC; and PF Monroe Properties LLC presented a
question about whether Congress exceeded its authority under the Commerce Clause in
regulating intrastate critical habitats. The Court held Markle's petition, granted it, and vacated
the judgment, and remanded the case for further consideration in light of *Weyerhaeuser*. *Markle*
*Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*, No. 17-74, 139 S. Ct. 50 (Dec. 3, 2018).

precedential value, this court finds persuasive its reasoning on the Commerce Clause, because *Markle* is the most recent and directly applicable articulation by the Fifth Circuit on how the court analyzes intrastate activities regulated by the Act under the Commerce Clause. The Court in *Weyerhaeuser* did not consider the constitutionality of the Act's critical-habitat-designation provision under the Commerce Clause, nor whether such a question should be analyzed under the Necessary and Proper Clause. Instead, *Weyerhaeuser* involved a question of statutory interpretation of the critical-habitat provision of the Act.[11]

Yearwood finally asserts that Supreme Court in *Sebelius* "found that the Affordable Care Act could not be justified by the Commerce Clause when viewed through the Necessary and Proper Clause." Yearwood repeatedly, but improperly, refers to a solo concurrence in *Sebelius* as the Court's holding. The majority decided the case based on Congress's taxing power, not on the Necessary and Proper Clause. 567 U.S. at 538-539, 564–74. Accordingly, the court does not find Yearwood's invocation of a concurring opinion in *Sebelius* to be persuasive authority.

In sum, this court recognizes that *Raich* and *Whaley* mention the Necessary and Proper Clause. However, these passing references are not enough to shift the well-established Commerce Clause analysis—one the Fifth Circuit has twice applied in considering the constitutionality of the Act—to one that has not been adopted by a majority of the Supreme Court nor by the Fifth Circuit in a factually analogous case.[12] Accordingly, the court will

---

[11] More specifically, the Court granted certiorari to consider whether a critical habitat need be currently habitable; the Fifth Circuit held it did not. *Weyerhaeuser*, 139 S. Ct. at 364. The Supreme Court also granted certiorari to consider whether the Service's decision to exclude an area as a critical habitat is subject to judicial review; Fifth Circuit held that it is not. *Id.*

[12] Yearwood also asserts that the rational-basis test applied in *GDF Realty* "is no longer sufficient in this circuit" because the "Fifth Circuit has since rejected this no-evidence approach to rational-basis scrutiny in other contexts." *See, e.g.*, *Castille*, 712 F.3d at 223 ("Our analysis does not proceed with abstraction for hypothesized ends and means do not include post hoc hypothesized facts."). *Castille* analyzes the constitutionality of a state casket regulation under

continue to follow *GDF Realty* and concludes that the Service's regulation of the harvestman does not violate the Commerce Clause.

### C. TENTH AMENDMENT

Yearwood argues that Congress's regulation of the harvestman violates the Tenth Amendment, but devotes no briefing to the issue. U.S. Const. Amend. X. "Arguments that are insufficiently addressed in the body of the brief, however, are waived." *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 n.7 (5th Cir. 2003) (citing *Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 343 n.3 (5th Cir. 2002)) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived"). Accordingly, the court concludes that Yearwood waived this argument.

## V.    CONCLUSION

The court concludes the 2017 finding is arbitrary, capricious, and not in accordance with law. When a reviewing court concludes an agency action to have been carried out "without observance of procedure required by law," the court shall "hold unlawful and set aside" the action. 5 U.S.C. § 706. Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment filed October 5, 2017 (Dkt. No. 132) is **GRANTED** with regard to the Stewards's claim that the Service acted arbitrarily and capriciously. The court will vacate the 2017 finding and remand the 2017 finding to the Service for further consideration consistent with this opinion. In all other respects, the motion is **DENIED**.

---

the Due Process and Equal Protection Clauses of the Fourteenth Amendment, to determine whether the regulation has a rational connection to the state's police powers. *Castille*, 712 F.3d at 221–22. In so doing, the Court states that "a hypothetical rationale, even post hoc, cannot be fantasy." *Id.* at 223. However, *Castille* does not involve a Commerce Clause challenge and cannot stand for a broad refashioning of the test used in Commerce Clause challenges, as Yearwood asserts.

**IT IS FURTHER ORDERED** that Federal Defendants' Cross Motion for Summary Judgment filed December 15, 2017 (Dkt. Nos. 142) is **GRANTED** as to its argument that the Service considered whether the harvestman was listed in error. In all other respects, the motion is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant-Intervenors' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment filed December 21, 2017 (Dkt. No. 147) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff-Intervenors' Motion for Summary Judgment filed October 10, 2017 (Dkt. No. 133) is **GRANTED** to the following extent: Yearwood's arguments are not barred by the statute of limitations. In all other respects, the motion is **DENIED**.

**IT IS FURTHER ORDERED** that Federal Defendants' Cross-Motion for Summary Judgment filed December 15, 2017 (Dkt. Nos. 145) and Defendant-Intervenors' Cross-Motion for Summary Judgment filed December 22, 2017 (Dkt. Nos. 151) are **GRANTED** to the following extent: Congress's regulation of a "take" of the harvestman under the Act is a valid exercise of the Commerce Clause power. In all other respects, the motions are **DENIED**.

**IT IS FINALLY ORDERED** that Federal Defendants' Opposed Motion to Strike Four Exhibits Attached to Plaintiffs' Reply Brief [Dkt. Nos. 156-6, 156-7, 156-8, 156-9 & 157-6, 157-7, 157-8, 157-9] and Memorandum in Support filed February 16, 2018 (Dkt. No. 159) is **DISMISSED**, as the court did not consider these exhibits.

SIGNED this **28th** of March, 2019.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE